**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALCON VISION, LLC, | Case No.: 1:18-cv-00407-NG-RLM |
| Plaintiff, | |
| v. | Judge Nina Gershon |
| LENS.COM, INC. | |
| Defendant. | |
| LENS.COM, INC., | |
| Counterclaim Plaintiff, | |
| v. | |
| ALCON VISION, LLC, and NOVARTIS AG, | |
| Counterclaim Defendants. | |

**DEFENDANT LENS.COM'S SECOND AMENDED**
**ANSWER, DEFENSES, AND COUNTERCLAIMS**

THORPE NORTH & WESTERN, LLP
Mark Bettilyon (admitted *pro hac vice*)
Peter M. de Jonge (admitted *pro hac vice*)
Catherine M. Maness (admitted *pro hac vice*)
175 S. Main St., Suite 900
Salt Lake City, UT 84111
Telephone: (801) 566-6633
Facsimile: (801) 566-0750
Email: mark.bettilyon@tnw.com
        dejonge@tnw.com
        catherine.maness@tnw.com

CADAWALADER, WICKERSHAM & TAFT
LLP
William J. Natbony (WJN 5507)
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: bill.natbony@cwt.com

## ANSWER AND COUNTERCLAIM

Defendant Lens.com, Inc. ("Lens.com") answers Plaintiff Alcon Vision LLC's First Amended Complaint ("FAC") as follows:

## JURISDICTION AND VENUE

1.      Lens.com admits that this Court has subject matter jurisdiction over these causes of action based on 15 U.S.C. § 1121 and/or 28 U.S.C. §§ 1331, 1338(a), 1367, however, Lens.com denies any liability thereunder.

2.      Pursuant to this Court's denial of Lens.com's Motion to Dismiss, Lens.com admits that this Court has personal jurisdiction over Lens.com for this action only.  Lens.com admits it operates a website.  Lens.com denies any liability pursuant to this action and denies the remaining allegations of Paragraph 2 of the FAC.

3.      Pursuant to this Court's denial of Lens.com's Motion to Transfer, Lens.com admits venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## PARTIES

4.      Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 4 of the FAC and, therefore, denies them.

5.      Lens.com admits that it is a corporation organized and existing under the laws of the State of Nevada, with a principal place of business in Las Vegas, Nevada.  Lens.com admits it operates multiple national websites, including www.lens.com, which customers may interact with.  Lens.com admits it stores its inventory of contact lens at a distribution center located in Louisiana, Missouri.  Lens.com denies the remaining allegations of Paragraph 5.

1

## STATEMENT OF FACTS

6.      Lens.com states that Paragraph 6 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 6 of the FAC and, therefore, denies them.

7.      Lens.com states that Paragraph 7 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 7 of the FAC and, therefore, denies them.

8.      Lens.com states that Paragraph 8 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 8 of the FAC and, therefore, denies them.

9.      Lens.com states that Paragraph 9 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 9 of the FAC and, therefore, denies them.

10.     Lens.com states that Paragraph 10 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 10 of the FAC and, therefore, denies them.

11.     Lens.com states that Paragraph 11 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph

requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 11 of the FAC and, therefore, denies them.

12.     Lens.com states that Paragraph 12 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 12 of the FAC and, therefore, denies them.

13.     Lens.com states that Paragraph 13 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 13 of the FAC and, therefore, denies them.

14.     Lens.com states that Paragraph 14 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 14 of the FAC and, therefore, denies them.

15.     Lens.com states that Paragraph 15 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 15 of the FAC and, therefore, denies them.

16.     Lens.com states that Paragraph 16 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 16 of the FAC and, therefore, denies them.

17.     Lens.com states that Paragraph 17 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 17 of the FAC and, therefore, denies them.

18.     Lens.com admits that contact lenses are medical devices which are regulated by the U.S. Food and Drug Administration to ensure their safety and efficacy.  Lens.com admits that patients may only obtain contact lenses via a valid prescription.  Lens.com is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 18 of the FAC and, therefore, denies them.

19.     Lens.com states that Paragraph 19 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 19 of the FAC and, therefore, denies them.

20.     Lens.com states that Paragraph 20 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 20 of the FAC and, therefore, denies them.

21.     Lens.com states that Paragraph 21 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 21 of the FAC and, therefore, denies them.

22.     Lens.com states that Paragraph 22 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph

requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 22 of the FAC and, therefore, denies them.

23.     Lens.com states that Paragraph 23 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 23 of the FAC and, therefore, denies them.

24.     Lens.com states that Paragraph 24 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 24 of the FAC and, therefore, denies them.

25.     Lens.com states that Paragraph 25 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 25 of the FAC and, therefore, denies them.

26.     Lens.com states that Paragraph 26 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 26 of the FAC and, therefore, denies them.

27.     Lens.com states that Paragraph 27 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 27 of the FAC and, therefore, denies them.

28.     Lens.com states that Paragraph 28 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 28 of the FAC and, therefore, denies them.

29.     Lens.com states that Paragraph 29 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 29 of the FAC and, therefore, denies them.

30.     Lens.com states that Paragraph 30 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 30 of the FAC and, therefore, denies them.

31.     Lens.com states that Paragraph 31 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 31 of the FAC and, therefore, denies them.

32.     Lens.com states that Paragraph 32 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 32 of the FAC and, therefore, denies them.

33.     Lens.com states that Paragraph 33 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph

requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 33 of the FAC and, therefore, denies them.

34.     Lens.com states that Paragraph 34 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 34 of the FAC and, therefore, denies them.

35.     Lens.com states that Paragraph 35 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 35 of the FAC and, therefore, denies them.

36.     Lens.com states that Paragraph 36 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 36 of the FAC and, therefore, denies them.

37.     Lens.com states that Paragraph 37 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 37 of the FAC and, therefore, denies them.

38.     Lens.com states that Paragraph 38 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 38 of the FAC and, therefore, denies them.

39.     Lens.com states that Paragraph 39 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 39 of the FAC and, therefore, denies them.

40.     Lens.com states that Paragraph 40 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 40 of the FAC and, therefore, denies them.

41.     Lens.com states that Paragraph 41 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 41 of the FAC and, therefore, denies them.

42.     Lens.com states that Paragraph 42 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 42 of the FAC and, therefore, denies them.

43.     Lens.com states that Paragraph 43 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 43 of the FAC and, therefore, denies them.

44.     Lens.com states that Paragraph 44 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph

requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 44 of the FAC and, therefore, denies them.

45.     Lens.com admits that U.S. Trademark Registration No. 1,055,870 purports to be for the mark ALCON® for "contact lens wetting and soaking solutions", among other uses. Paragraph 45 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 45 of the FAC and, therefore, denies them.

46.     Lens.com admits that U.S. Trademark Registration No. 3,964,835 purports to be for the stylized ALCON® mark shown in Paragraph 46 for "solutions for use with contact lenses", among other uses.  Paragraph 46 contains legal conclusions which require no response. To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 46 of the FAC and, therefore, denies them.

47.     Lens.com admits that U.S. Trademark Registration No. 4,560,685 purports to be for the mark ALCON® for "contact lenses".  Paragraph 47 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 47 of the FAC and, therefore, denies them.

48.     Lens.com admits that U.S. Trademark Registration No. 5,412,293 purports to be for the stylized ALCON® mark shown in Paragraph 48 for "contact lenses".  Paragraph 48 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 48 of the FAC and, therefore, denies them.

49.     Lens.com admits that Alcon Laboratories, Inc. purports to be the registered owner of 4 U.S. Copyrights under Registration Nos. VA 2-090-281, VA 2-090-283, VA 2-095-867, and VA 2-095-868.  To the extent this Paragraph requires a further response, Lens.com is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 49 of the FAC and, therefore, denies them.

50.     Lens.com states that Paragraph 50 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 50 of the FAC and, therefore, denies them.

51.     Lens.com admits that U.S. Trademark Registration No. 5,137,710 purports to be for the AQUACOMFORT PLUS mark shown in Paragraph 51 for "contact lenses" and that the registration was issued on February 7, 2017.  Paragraph 51 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 51 of the FAC and, therefore, denies them.

52.     Lens.com admits that U.S. Trademark Registration No. 4,556,224 purports to be for the Teardrop Logo mark shown in Paragraph 52 for "contact lenses" and that the registration was issued on June 24, 2014.  Paragraph 52 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 52 of the FAC and, therefore, denies them.

53.     Lens.com admits that U.S. Trademark Registration No. 3,687,534 purports to be for the AQUACOMFORT mark shown in Paragraph 53 for "contact lenses" and that the

registration was issued on September 22, 2009.  Paragraph 53 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 53 of the FAC and, therefore, denies them.

54.     Lens.com admits that U.S. Trademark Registration No. 2,924,933 purports to be for the LIGHTSTREAM mark shown in Paragraph 54 for "contact lenses and optical lenses" and that the registration was issued on February 8, 2005.  Paragraph 54 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 54 of the FAC and, therefore, denies them.

55.     Lens.com admits that U.S. Trademark Registration No. 3,555,421 purports to be for the DAILIES AQUACOMFORT PLUS mark shown in Paragraph 55 for "contact lenses" and that the registration was issued on December 30, 2008.  Paragraph 55 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 55 of the FAC and, therefore, denies them.

56.     Lens.com admits that U.S. Trademark Registration No. 5,501,047 purports to be for the trade dress for the front panel of the DAILIES AQUACOMFORT PLUS packaging shown in Paragraph 56 for "contact lenses" and that the registration was issued on June 26, 2018. Lens.com also admits the registration appears to have been issued from U.S. Application Serial No. 87/586,440 which shows a filing date of August 28, 2017, claims a first use date of May 31, 2017, and the application appears to have been published for opposition on May 10, 2018.

Lens.com is without knowledge or information sufficient to form a belief regarding any remaining allegations of Paragraph 56 of the FAC and, therefore, denies them.

57.     Lens.com states that Paragraph 57 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 57 of the FAC and, therefore, denies them.

58.     Lens.com admits that U.S. Trademark Registration No. 2,946,628 purports to be for the O2 mark shown in Paragraph 58 for "contact lenses" and that the registration was issued on May 3, 2005.  Paragraph 58 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 58 of the FAC and, therefore, denies them.

59.     Lens.com admits that U.S. Trademark Registration No. 3,308,130 purports to be for the O2 OPTIX mark shown in Paragraph 59 for "contact lenses" and that the registration was issued on October 9, 2007.  Paragraph 59 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 59 of the FAC and, therefore, denies them.

60.     Lens.com admits that U.S. Trademark Registration No. 3,308,131 purports to be for the stylized O2 OPTIX mark shown in Paragraph 60 for "contact lenses" and that the registration was issued on October 9, 2007.  Paragraph 60 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without

knowledge or information sufficient to form a belief regarding those allegations of Paragraph 60 of the FAC and, therefore, denies them.

61.     Lens.com states that Paragraph 61 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 61 of the FAC and, therefore, denies them.

62.     Lens.com admits that U.S. Trademark Registration No. 3,490,248 purports to be for the AIR OPTIX mark shown in Paragraph 62 for "contact lenses" and that the registration was issued on August 19, 2008.  Paragraph 62 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 62 of the FAC and, therefore, denies them.

63.     Lens.com admits that U.S. Trademark Registration No. 3,490,249 purports to be for the stylized AIR OPTIX mark shown in Paragraph 63 for "contact lenses" and that the registration was issued on August 19, 2008.  Paragraph 63 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 63 of the FAC and, therefore, denies them.

64.     Lens.com admits that U.S. Trademark Registration No. 4,674,449 purports to be for the stylized AIR OPTIX COLORS mark shown in Paragraph 64 for "contact lenses" and that the registration was issued on January 20, 2015.  Paragraph 64 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without

knowledge or information sufficient to form a belief regarding those allegations of Paragraph 64 of the FAC and, therefore, denies them.

65.     Lens.com admits that U.S. Trademark Registration No. 5,146,779 purports to be for the AIR OPTIX PLUS HYDRAGLYDE mark shown in Paragraph 65 for "contact lenses" and that the registration was issued on February 21, 2017.  Paragraph 65 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 65 of the FAC and, therefore, denies them.

66.     Lens.com admits that U.S. Trademark Registration No. 5,186,616 purports to be for the HYDRAGLYDE mark shown in Paragraph 66 for "contact lenses" and that the registration was issued on April 18, 2017.  Paragraph 66 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 66 of the FAC and, therefore, denies them.

67.     Lens.com admits that U.S. Application Serial No. 87/835,553 purports to be for the trade dress for the front panel of the AIR OPTIX PLUS HYDRAGLYDE packaging shown in Paragraph 67 for "contact lenses" and that this application was filed on March 15, 2018. Lens.com is without knowledge or information sufficient to form a belief regarding any remaining allegations of Paragraph 67 of the FAC and, therefore, denies them.

68.     Lens.com admits that U.S. Trademark Registration No. 3,429,280 purports to be for the CIBA VISION mark shown in Paragraph 68 for "contact lenses" and that the registration was issued on May 20, 2008.  Paragraph 68 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or

information sufficient to form a belief regarding those allegations of Paragraph 68 of the FAC and, therefore, denies them.

69.     Lens.com admits that U.S. Trademark Registration No. 4,425,860 purports to be for the stylized CIBA VISION mark shown in Paragraph 69 for "contact lenses" and that the registration was issued on October 29, 2013.  Paragraph 69 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com is without knowledge or information sufficient to form a belief regarding those allegations of Paragraph 69 of the FAC and, therefore, denies them.

70.     Lens.com states that Paragraph 70 does not contain any allegations directed to Lens.com and, therefore, requires no answer from Lens.com.  To the extent this Paragraph requires a response, Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 70 of the FAC and, therefore, denies them.

71.     Lens.com admits that it advertises and sells contact lenses to consumers. Lens.com admits it operates multiple national websites, including www.lens.com.  Lens.com admits that the "About Us" section of the Lens.com website states that Lens.com has "the largest independently held inventory of contact lenses".  Lens.com admits it stores its inventory of contact lens at a distribution center, located in Louisiana, Missouri.  Lens.com admits it directs shipment of contact lenses to consumers, including consumers in New York, through its distribution center in Missouri.  Lens.com is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 71 of the FAC and, therefore, denies them.  Lens.com denies the remaining allegations of Paragraph 71.

72.     Lens.com admits that its employee, Cary Samourkachian, has had business discussions with multiple representatives of Alcon over multiple years.  Lens.com admits that the

parties discussed Lens.com purchasing products directly from Alcon.  Lens.com admits that each of the parties have started and/or maintained these discussions at various times.  Lens.com admits that the parties have been unable to come to an agreement.  Lens.com denies the remaining allegations of Paragraph 72.

73.     Lens.com admits it sells and ships contact lenses to consumers in New York from its distribution center in Missouri.  Lens.com admits it sold and shipped the contact lenses reportedly purchased by Alcon in this litigation.  Lens.com denies the remaining allegations of Paragraph 73.

74.     Lens.com admits it operates multiple websites, including www.lens.com, www.justlenses.com, www.contactsamerica.com, and www.eurolens.com.  Lens.com admits these websites may be accessed by consumers across the United States and customers may purchase contact lenses through these websites which may be shipped anywhere in the United States, including New York.  Lens.com admits each of these websites allows a customer to create an account with an email address or username and password.  Each customer is able to save his or her billing and/or shipping information as well as provide the website his or her contact lens prescription for verification.  Lens.com denies the remaining allegations of Paragraph 74.

75.      Lens.com admits it operates a live chat feature to aid its customers which is easily accessible on the Lens.com website.  Lens.com admits has a contract with LivePerson, Inc.  Lens.com denies the remaining allegations of Paragraph 75.

76.     Lens.com admits it maintain a national toll-free telephone number for its customers to call if they have any questions.  Lens.com admits that it also maintains a local Missouri phone number and mailing address for its distribution center for customers if they have any questions.  Lens.com denies the remaining allegations of Paragraph 76.

77.     Lens.com admits it makes customer reviews available on its website.  Lens.com admits that multiple of these reviews have been made by customers who say they reside in New York.  Lens.com is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 77 of the FAC and, therefore, denies them.

78.     Lens.com admits it operates a blog entitled "eyeSTYLE" which provides valuable information and articles to its customers across the United States.  Lens.com is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 78 of the FAC and, therefore, denies them.

79.     Lens.com admits it purchases and imports genuine Alcon contact lenses overseas. Lens.com is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 79 of the FAC and, therefore, denies them.

80.     Lens.com admits it verifies the contact lens prescriptions of its customers before it fulfills contact lens orders and that it frequently communicates with eye-care practitioners. Lens.com denies the remaining allegations of Paragraph 80.

81.     Lens.com states that Paragraph 81 contains allegations not directed to Lens.com and, therefore, requires no answer from Lens.com.  Lens.com is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 81 of the FAC and, therefore, denies them.

82.     Lens.com admits it advertises and sells Alcon products on its websites using photographs of the products sold.  Lens.com denies the remaining allegations of Paragraph 82 of the FAC.

83.     Lens.com admits it advertises and sells Alcon products on its websites using photographs of the products sold.  Lens.com denies the remaining allegations of Paragraph 83 of the FAC.

84.     Lens.com admits it sells and ships contact lenses to customers in New York. Lens.com is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 84 of the FAC and, therefore, denies them.

85.     Paragraph 85 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com denies the allegations in Paragraph 85 of the FAC.

86.     Paragraph 86 contains legal conclusions which require no response.  To the extent these allegations require a response, Lens.com denies the allegations in Paragraph 86 of the FAC.

87.     Lens.com denies the allegations in Paragraph 87 of the FAC.

88.     Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 88 of the FAC and, therefore, denies them.

89.     Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 89 of the FAC and, therefore, denies them.  Lens.com denies the remaining allegations of Paragraph 89 of the FAC.

90.     Lens.com admits it has sold O2 OPTIX contact lenses to customers in the United States.  Lens.com is without knowledge or information sufficient to form a belief regarding the remaining allegations of Paragraph 90 of the FAC and, therefore, denies them.

91.     Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 91 of the FAC and, therefore, denies them.  Lens.com denies the remaining allegations of Paragraph 91 of the FAC.

92.     Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 92 of the FAC and, therefore, denies them.  Lens.com denies the remaining allegations of Paragraph 92 of the FAC.

93.     Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 93 of the FAC and, therefore, denies them.  Lens.com denies the remaining allegations of Paragraph 93 of the FAC.

94.     Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 94 of the FAC and, therefore, denies them.  Lens.com denies the remaining allegations of Paragraph 94 of the FAC.

95.     Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 95 of the FAC and, therefore, denies them.  Lens.com denies the remaining allegations of Paragraph 95 of the FAC.

96.     Lens.com admits it advertises and sells Alcon products on its websites.  Lens.com denies the remaining allegations of Paragraph 96 of the FAC.

97.     Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 97 of the FAC and, therefore, denies them.  Lens.com denies the remaining allegations of Paragraph 97 of the FAC.

98.     Lens.com is without knowledge or information sufficient to form a belief regarding the allegations of Paragraph 98 of the FAC and, therefore, denies them.  Lens.com denies the remaining allegations of Paragraph 98 of the FAC.

## FIRST CLAIM FOR RELIEF
## Trademark Infringement Under 15 U.S.C. § 1114

99.     Lens.com incorporates its responses to the foregoing allegations of the FAC as if fully set forth herein.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied.

104.    Denied.

105.    Denied.

106.    Denied.

## SECOND CLAIM FOR RELIEF
## False Designation of Origin Under 15 U.S.C. § 1125(a)

107.    Lens.com incorporates its responses to the foregoing allegations of the FAC as if fully set forth herein.

108.    Denied.

109.    Denied.

110.    Denied.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.    Denied.

**THIRD CLAIM FOR RELIEF**
**Deceptive Trade Practices Under New York General Business Law § 349**

116.    Lens.com incorporates its responses to the foregoing allegations of the FAC as if fully set forth herein.

117.    Denied.

118.    Denied.

119.    Denied.

120.    Denied.

121.    Denied.

122.    Denied.

123.    Denied.

**FOURTH CLAIM FOR RELIEF**
**False Advertising Under New York General Business Law § 350**

124.    Lens.com incorporates its responses to the foregoing allegations of the FAC as if fully set forth herein.

125.    Denied.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Denied.

130.    Denied.

**FIFTH CLAIM FOR RELIEF**
**Trademark Infringement Under New York Common Law**

131.    Lens.com incorporates its responses to the foregoing allegations of the FAC as if fully set forth herein.

132.    Denied.

133.    Denied.

## SIXTH CLAIM FOR RELIEF
### Unfair Competition Under New York Common Law

134.    Lens.com incorporates its responses to the foregoing allegations of the FAC as if fully set forth herein.

135.    Denied.

136.    Denied.

## PRAYER FOR RELIEF

137.    Lens.com denies Alcon is entitled to any of the relief requested in its Prayer for Relief and requests the Court deny Alcon's prayer for relief in its entirety, with prejudice.

## DEMAND FOR JURY TRIAL

138.    Pursuant to Fed. R. Civ. P. 38(b), Lens.com demands a trial by jury on all issues so triable.

## DEFENSES

By asserting the following Defenses, the burden of proof has not shifted from Alcon for any issue where Alcon bears the burden.  Lens.com reserves the right to amend its response, including, but not limited to, asserting additional affirmative and other defenses as they may be discovered or otherwise become available.

## FIRST DEFENSE
### General Denial

Lens.com denies all averments of the FAC not specifically admitted herein, including, but not limited to, all titles, headings, and other recitations.

**SECOND DEFENSE**
**Failure to State a Claim**

Alcon's FAC fails to state any claim against Lens.com upon which relief can be granted. For example, in the FAC Alcon apparently claims that certain product packaging for some of its products, including, but not limited to, the "older," "rest of world" and "global" packaging for the Dailies AquaComfort Plus and Air Optix Plus Hydraglyde, are not authorized for sale in the United States. However, Lens.com is informed and believes that these products all contain an "Rx Only" symbol, which, according to Alcon's own package inserts, means "CAUTION: Federal (United States) law restricts this device to sale by or on the order of a licensed eye care professional." The use of the "Rx only" symbol indicates that the underlined product is eligible to be sold in the United States. By using this marketing on its packaging, Alcon has acknowledged that such products are authorized to be sold, distributed and prescribed in the United States and that these products have been and will be sold, distributed, and prescribed in the U.S. If these products cannot be sold in the United States, then Alcon must remove this symbol from its packages.

Lens.com is further informed and believes that all of the products at issue in this dispute contain markings and symbols only having relevance to consumers in the United States, including "®," TM and "©." Lens.com is also informed and believes that Alcon provides English language literature and other documents which further inform consumers and purchasers of Alcon products that such products comply with U.S. regulations and are authorized for sale in the United States. Additionally, Lens.com is informed and believes that, at least, the Dailies AquaComfort Plus products contain the following statement on the so-called "older" packaging allegedly not authorized for sale in the United States: "For USA: Request Package Insert for Clinical Details" ("For USA" phrase). Collectively, the other symbols, phrases and statements

23

shall be referred to as "U.S. Symbols and Statements."  Alcon's use of U.S. Symbols and Statements on its products and in its literature  to promote its products demonstrates that these products can and will be sold, distributed, and prescribed in the United States and that Alcon has authorized such products to be sold, distributed, and prescribed in the United States.

Lens.com is also informed and believes that all of Alcon's products sold anywhere in the world also contain a "CE" symbol, including on Alcon product packaging that it claims is intended for sale only in the U.S. According to Alcon's own package inserts, the "CE" symbol is the European Conformity sign which is commonly understood to mean that the product complies with all relevant European Union legislation.  Alcon's continued use of U.S. Symbols and Statements and the "CE" symbol on all of its packaging and product literature, on products sold everywhere in the world, is evidence that Alcon has represented that all of its products meet all of the legal requirements required to sell contact lenses in the United States and in the European Union.  Furthermore, Alcon's contention that certain of its products are intended only for sale in the U.S is belied by its intentional placement of the "CE" symbol on those products.

### THIRD DEFENSE
### Failure to Join Necessary Party

Alcon's claims should be dismissed for failure to join Novartis AG and Alcon, Inc. as necessary parties. Novartis AG previously owned many of the trademarks in dispute at the time this lawsuit was filed and the underlying decisions relevant to this lawsuit were made.  Novartis AG is, therefore, an indispensable party to this lawsuit.  Alcon, Inc. is now the listed owner of the trademarks previously owned by Novartis AG.  As the listed owner of trademarks-in-suit, Alcon, Inc. is an indispensable party to this lawsuit.

**FOURTH DEFENSE**
**Unclean Hands**

Alcon's claims are barred, in whole or in part, by the equitable doctrine of unclean hands based upon, at least, Alcon's anticompetitive and unlawful restraint of trade activities fully set forth in Lens.com's counterclaims and its failure to address the issues set forth in the FAC for more than 20 years.

**FIFTH DEFENSE**
**Estoppel**

Alcon's claims are barred, in whole or in part, by the equitable doctrine of estoppel based upon, at least, Alcon's knowledge of Lens.com's business activities, including Lens.com's purchase overseas and resale of genuine Alcon contact lenses in the United States containing U.S. Symbols and Statements and the "CE" symbol.   For more than 20 years, Lens.com has reasonably and detrimentally relied on Alcon's failure to raise any issues regarding alleged health and safety concerns or object to Lens.com's related business activities, including, but not limited to, Lens.com's purchase of genuine Alcon contact lenses abroad for resell into the United States, including the sale of lenses in "older" packaging.

**SIXTH DEFENSE**
**Waiver**

Alcon's claims are barred, in whole or in part, by the doctrine of waiver based upon, at least, Alcon's intentional failure to take any action regarding alleged health and safety concerns or other issues related to Lens.com's purchase overseas and resale of genuine Alcon contact lenses in the United States for more than 20 years.  Instead, Alcon has repeatedly attempted to convince Lens.com to purchase directly from Alcon or an authorized distributor, while simultaneously never attempting to force Lens.com to stop purchasing genuine Alcon contact

lenses overseas for resale in the United States.  As a result, Alcon has waived its right to enforce its claims.

### SEVENTH DEFENSE
### Implied License

Alcon's claims are barred, in whole or in part, because Alcon's intentional failure to take any action with respect to its knowledge of Lens.com's business practices relating to its purchase overseas and resale of genuine Alcon contact lenses in the United States for more than 20 years created an implied license between Alcon and Lens.com.

### EIGHTH DEFENSE
### Laches

Alcon's claims are barred, in whole or in part, by the equitable doctrine of laches. Specifically, Alcon has known of Lens.com's business practices, including, but not limited to, Lens.com's sales in the United States of Alcon contact lenses purchased overseas for, at least, twenty years.  These products utilize the trademarks-in-suit. They also bear symbols demonstrating such products may be safely sold to consumers in the United States. During this time, Alcon has repeatedly altered its packaging without requiring any consumers or retailers to immediately cease selling products in older packaging. Instead of actively attempting to raise alleged health and safety concerns or enforce its alleged trademark claims, Alcon has inexcusably delayed bringing the instant lawsuit for, at least, twenty years.  Lens.com will be prejudiced if Alcon is permitted to assert its alleged rights after Alcon's twenty year delay in bringing suit.

### NINTH DEFENSE
### Acquiescence

Alcon's claims are barred, in whole or in part, by the equitable doctrine of acquiescence. Specifically, Alcon has known of Lens.com's use of its trademarks and sales of its products for

more than twenty years.  During this twenty plus year span Alcon and Lens.com have been in frequent communication attempting to negotiate an agreement.  Alcon has never questioned Lens.com's business or purchasing practices or asked Lens.com to refrain from purchasing genuine Alcon products overseas.  Lens.com will be unduly prejudiced if Alcon is permitted to assert its alleged rights after twenty years of acquiescing to Lens.com's business model.

## TENTH DEFENSE
### Statutes of Limitations

Alcon's claims are barred by any applicable statutes of limitations based upon Alcon's unreasonable and inexcusable delay in enforcing its rights.

## ELEVENTH DEFENSE
### 16 C.F.R. § 315

Lens.com is authorized to sell Alcon's genuine contact lenses pursuant to the Federal Trade Commission's Contact Lens Rule.

## TWELFTH DEFENSE
### 15 U.S.C. § 7603(f)/16 C.F.R. § 315

Alcon manufactures the same contact lenses for its Dailies AquaComfort Plus and Air Optix Plus Hydraglyde products under multiple labels.  All of Alcon's contact lens packaging and literature contain U.S. Symbols and Statements, which indicate that Alcon's contact lenses may be sold in the United States or are identical to lenses sold in the United States.  As such, Lens.com is entitled to fill a prescription with any such lenses.

## THIRTEENTH DEFENSE
### Trademark Misuse

To the extent Alcon's registered trademarks have become incontestable, such incontestability is barred, in whole or in part, because Alcon has used its trademarks to violate the antitrust laws of the United States.  Specifically, and as fully detailed in Lens.com's

counterclaims, Alcon has registered and used its trademarks and changed the trade dress and used the related trademarks to limit competition and stifle Lens.com's sales of Alcon products. *See* 15 U.S.C. § 1115(b)(7).

## FOURTEENTH DEFENSE
## 16 C.F.R. § 315.11

Alcon's state-law based claims are preempted, in whole or in part, by federal law, including, but not limited to, the Fairness to Contact Lens Consumers Act, 15 U.S.C. *et seq.* To the extent the New York state law Alcon relies upon is inconsistent with the Fairness to Contact Lens Consumers Act, New York law and any other state law is pre-empted. *See* 15 U.S.C. § 1115(b)(7).

## FIFTEENTH DEFENSE
## Innocent Infringement

Lens.com is not liable for any alleged infringement of Alcon's trademarks because any infringement was innocent.

## SIXTEENTH DEFENSE
## Intervening Actors

Lens.com is not liable for any intervening acts of others over which Lens.com has no control.

## SEVENTEENTH DEFENSE
## First Sale Doctrine

Lens.com sales of genuine Alcon contact lenses, including all lenses sold bearing U.S. Symbols and Statements in the United States, are lawful pursuant to the first sale doctrine because Alcon manufactured the contact lenses and has informed consumers, doctors and others that all such contact lenses may be lawfully prescribed to patients in the United States.

## EIGHTEENTH DEFENSE
### Failure to Mitigate

Alcon's claims are barred, in whole or in part, because it failed to mitigate its alleged

damages.

## NINETEENTH DEFENSE
### Indemnification

Alcon has led Lens.com and other consumers in the United States and around the world

to believe all products which reference and/or are promoted using U.S. Symbols and Statements

are fully compliant with all FDA regulations and are authorized for sale by prescription in the

United States. To the extent that Alcon's products are not safe for user consumption in the

United States, Alcon is responsible for all damage and liability related thereto because it has

applied markings and other indicators on its product packaging affirmatively demonstrating that

these products are safe for use and consumption in the United States. If these claims are false,

Alcon must indemnify Lens.com for all damages and losses incurred by Lens.com as a

consequence of Alcon's false claims.

## TWENTIETH DEFENSE
### Recoupment/Set-Off

If Alcon is successful on any of its claims, any recovery owed to Alcon by Lens.com

shall be reduced or set-off by all of the damages owed to Lens.com pursuant to any time-barred

counterclaims alleged by Lens.com. For example, the statute of limitations for antitrust claims is

4 years from the time of discovery of these claims. Other counterclaims have different statute of

limitations. All of Lens.com's counterclaims and Alcon's trademark claims arise from the same

series of transactions and occurrences.  Accordingly, under New York law, common law and the

principles of equity, Lens.com is entitled to set-off/reduce any damages Alcon may recover by

the time-barred damages Lens.com suffered pursuant to the false, unfair, unlawful and

anticompetitive conduct alleged in Lens.com's counterclaims.

## TWENTY-FIRST DEFENSE
### Adequacy of Remedy at Law

The injury suffered by Alcon, if any, is not irreparable and can be adequately

compensated by monetary damages.  Accordingly, Alcon is not entitled to seek injunctive relief

or any other equitable relief.

## TWENTY-SECOND DEFENSE
### Bad Faith

Alcon's claims are brought in bad faith and are an inexcusable attempt to control

competition and limit the sales of Alcon's products by online retailers like Lens.com.

## TWENTY-THIRD DEFENSE
### Preemption Pursuant to FDCA

Alcon's claims are preempted, in whole or in part, by the Food, Drug & Cosmetics Act

("FDCA"), as the claims fall within the exclusive jurisdiction of the United States under the

FDCA.

## TWENTY-FOURTH DEFENSE
### Copyright First Sale Doctrine

Lens.com's sales of genuine Alcon contact lenses is authorized by the copyright first sale

doctrine.  *See* 17 U.S.C. § 109, *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979 (2016),

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), and *Pearson Educ., Inc.*

*v. Allen Air Conditioning Co.*, 2013 U.S. Dist. LEXIS 153712 (S.D.N.Y. Oct. 22, 2013).

## TWENTY-FIFTH DEFENSE
### Abandonment of O2 Optix Trademarks

Alcon has previously admitted that it has not used the O2 Optix trademarks in the U.S.

since 2013.  As Alcon, and its indirect parent company and trademark owner, Alcon, Inc., have

not used the O2 Optix trademarks in the U.S. since 2013 and have no intent to resume use of the

O2 Optix trademarks, Alcon and Alcon, Inc. have abandoned their rights in the O2 Optix

trademarks.  As such, the O2 Optix trademarks cannot form the basis for any claim for relief

against Lens.com.

<div align="center">

**TWENTY-SIXTH DEFENSE**
**Affirmative Defenses**

</div>

Lens.com asserts the affirmative defenses listed in Fed. R. Civ. P. 8(c) and reserves the

right to assert additional affirmative defenses as their existence may be later established through

discovery.

<div align="center">

**COUNTERCLAIM**

</div>

Counterclaim Plaintiff Lens.com, Inc., by and through its undersigned counsel, hereby

states the following Counterclaim against Counterclaim Defendant Alcon Vision, LLC ("Alcon")

and Novartis AG ("Novartis").

**I.    Introduction**

1.    Lens.com's Counterclaim centers on Alcon's attempts to exclude Lens.com from

the contact-lens market because of the threat Lens.com poses to Alcon (and to Alcon's preferred

retailers) as a discount seller of contact lenses.

2.    Alcon has long sought to keep retailers from selling its contact lenses at discount

prices,[1] because (as described in more detail in paragraphs 46-59 below) contact-lens purchasing

decisions in the United States are largely controlled by eye-care practitioners ("ECPs"), who

prefer high lens prices, as high prices help increase the profit margins on lenses sold by ECPs.

Alcon's continuous efforts to engage in anti-competitive conduct have been the subject of

[1] ████████████████████████████████████

concern to both courts and state and federal legislative bodies, including the complaints or consolidated complaints *In re Disposable Contact Lens Antitrust Litigation*, No. 3:94-md-1030-HES (M.D. Fla.) [Dkt. 23], *In re Disposable Contact Lens Antitrust Litigation*, No. 3:15-md-2626-HES (M.D. Fla.) [Dkt. 135] (into which two of Lens.com's counterclaims have now been consolidated), and *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, 3:15-cv-734-HES-JRK (N.D. Cal.) [Dkt. 1].

3.     Over the course of recent years, Alcon has adopted a number of distinct strategies for combatting price discounting on its lenses, which alone and in combination have harmed Lens.com. These strategies include: (1) the creation, implementation, and enforcement of a Unilateral Pricing Policies ("UPP"), which imposes minimum retail prices for the sale of certain Alcon lenses; (2) the redesign of product packaging for certain Alcon lenses, which is intended to prevent the sale in the United States of lenses that are first distributed (at a lower wholesale price) in other countries; (3) the initiation of a group boycott of Lens.com; and (4) the use of both exclusive-dealing agreements and tying agreements. These actions are not unilateral: they have been planned and implemented in conjunction with non-discounting retailers, distributors, and other manufacturers.

4.     Alcon's goal with these strategies is to *decrease* competition in the retail market for contact lenses and, by extension, to keep retail prices for contact lenses artificially high.

5.     Forcing discount retailers to raise their prices on contact lenses increases the likelihood that consumers will purchase lenses from ECPs, who prescribe specific lenses to consumers.

6.     The increased likelihood that a consumer will purchase an Alcon lens from an ECP rather than through a discount retailer means that ECPs are more likely to prescribe an

Alcon lens than a lens that can be purchased elsewhere at a substantial discount and thereby benefits Alcon through increased sales.

7.     Decreased competition and higher prices, without any added benefits in product quality or product safety, harm discounting retailers like Lens.com, who enjoy competitive advantages stemming from their low prices and high levels of convenience.

8.     Lens.com has invested years of effort and millions of dollars into its business model, all of which will be lost if Alcon is allowed to press forward with this latest iteration of the pattern of anticompetitive tactics that it—along with ECPs and other manufacturers—has been using for decades.

## II.     Market Participants and Definitions

9.     As of 2013, retail sales of contact lenses in the United States totaled nearly $5 billion spread across four primary manufacturing firms: Johnson & Johnson (J&J) (43.2% market share, as of 2013), Alcon (then called Ciba Vision, 22.7%), Cooper Vision (22.1%), and Bausch & Lomb (B&L) (10.5%). At times, this Counterclaim refers to those four manufacturing firms collectively as "Manufacturers."

10.    Lenses produced by Manufacturers often pass through at least two levels of purchase and resale before reaching consumers. The first level is occupied by distributors (sometimes called "buying groups"), led by ABB Optical Group[2] but also including Nassau

Vision Group, New Era Optical, OOGP Inc., and Wisconsin Vision Associates ("WVA"), among others. At times, this Counterclaim refers to these entities collectively as "Distributors."

11.     The second level is occupied by retailers, which includes specialized optical chains (such as LensCrafters), mass merchandisers (such as Wal-Mart), wholesale clubs (such as Costco), online retailers (such as 1-800 Contacts and Lens.com), and ECPs. At times, this Counterclaim refers to these entities collectively as "Retailers."

12.     Despite higher prices, ECPs remain the dominant Retailers in the contact-lens industry. Though online sales have increased in recent years, a 2014 analysis found that online sales still only account for approximately 15% of total contact-lens sales.

13.     Though there are tens of thousands of ECPs in the United States, ECPs work through trade associations (including the American Optometric Association, or AOA) to request specific actions from Manufacturers and others in the industry. At times, this Counterclaim refers to these industry groups collectively as "Trade Associations."

14.     ECP "opinion leaders" sit on Manufacturer boards, craft publications advocating for particular policies, and communicate directly with managers and other employees working for Manufacturers, Distributors, and Retailers. At times, this Counterclaim refers to these individuals as "Key Opinion Leaders."

III.    **Summary of Lens.com's Counterclaims**

15.     Claims 1–6[3] of this Counterclaim are claims arising under state and federal law for antitrust violations. These causes of action are described in technical detail later in this

_____

[3] The seventh claim in Lens.com's previous Counterclaims has been consolidated into Claims 1–6. Claims 3 and 4, which are claims brought under Section 1 of the Sherman Act based on conduct related to Alcon's UPP strategy, have been consolidated into an MDL pending in the Middle District of Florida captioned *In re: Disposable Contact Lens Antitrust Litigation*, Case No. 3:15-md-2626-HES-JRK (M.D. Fla.).

Counterclaim. Lens.com's antitrust counterclaims incorporate several common classes of anticompetitive activity including, but not limited to, the following:

      a.     Alcon implemented a UPP strategy that began with an agreement between non-discounting Retailers and Alcon, in which the non-discounting Retailers agreed to prescribe and/or sell Alcon lenses ███████████████████████ ██████████████████████████████ ████████████████████████████████████ █████████████████████████ thus shielding the non-discounting Retailers from price competition.

      b.     Acting on ████████████████████████ █████████████████████████████████ ██████████████████████████████████ █████████████

      c.     Alcon implemented a packaging modification that was pretextual in nature, and on which it has based the instant trademark infringement action, which seeks to prohibit Lens.com from selling Alcon contact lenses except pursuant to an agreement.

      d.     The agreement Alcon has presented to Lens.com and attempted to force Lens.com to sign (an agreement that, upon information and belief, Alcon has reached with many other Retailers) contains unlawful exclusive-dealing clauses, under which Lens.com ██████████████████████████████████ would be prevented from obtaining Alcon lenses from any other source.

      e.     The agreement Alcon has presented to Lens.com also contains tying clauses, under which Lens.com's ability to purchase certain Alcon lenses was

conditioned on Lens.com purchasing *all types* of Alcon lenses directly from Alcon, not just those that are the subject of its claims of trademark infringement.

16.   The facts on which these claims are alleged are set forth below.

17.   Additionally, Counterclaims 8-10 of this Counterclaim are counterclaims sounding in trademark. These include claims based on the following conduct:

  a.   Alcon and Novartis AG's false advertisement and/or misleading representation of facts of certain products using the Rx Only and CE symbols and the American flag, as well as a variety of other symbols and phrases; and

  b.   A declaratory judgment action that Lens.com has not infringed the Alcon and Novartis trademarks.

18.   Again, the facts on which these claims are asserted are alleged below.

**IV.   Factual Background**

**A.   Parties, Jurisdiction, and Venue**

19.   Lens.com is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Las Vegas, Nevada.

20.   Alcon is a corporation organized and existing under the laws of the State of Delaware, with its corporate offices and principal place of business in Fort Worth, Texas.

21.   On information and belief, Alcon was a division of Novartis AG, but has now been "spun off" in a transaction that occurred in the first half of 2019.

22.   Novartis AG is a foreign corporation organized and existing under the laws of Switzerland with its principal place of business at Lichtstrasse 35, 4056 Basel, Switzerland.

23.   Novartis was the stated owner of many of the trademarks relevant to Lens.com's counterclaims when this lawsuit was filed and when the decisions underlying this lawsuit were

made. The trademarks previously owned by Novartis include, but are not limited to, the following: Reg. No. 5, 137,710 (AQUA COMFORTPLUS LENS); Reg. No. 4,556,224 (TEAR DROP DESIGN); Reg. No. 3,687,534 (AQUACOMFORT); Reg. No. 2,924,933 (LIGHTSTREAM), Reg. No. 3,555,421 and pending application Serial No. 87/586,440 (DAILIES AQUACOMFORT PLUS); Reg. No. 2,946,628 (O2); Reg. Nos. 3,308,130 and 3,308,131 (O2 OPTIX); Reg. Nos. 3,490,248 and 3,490,249 (AIR OPTIX); Reg. No. 4,674,449 (AIR OPTIX COLORS); Reg. No. 5,146,779 and pending application Serial No. 87/835,553 for the associated trade dress (AIR OPTIX PLUS HYDRAGLYDE); Reg. Nos. 3,429,280 and 4,425,860 (CIBA VISION) (collectively, the "Novartis Marks").

24.     Because Novartis was the owner of the Novartis Marks at the time this lawsuit was filed and when the decisions underlying this lawsuit were made, it is a necessary party to this dispute as Lens.com asserts that the Novartis Marks are no longer incontestable because these marks have been used as part of a 20-year campaign to violate the anti-trust laws.

25.     On information and belief, much of the product packaging at issue still identifies Novartis as the owner of copyrights ("Novartis Copyrights").

26.     Alcon is also the owner of certain copyrights used by Alcon to distribute contact lenses sold by Alcon ("Alcon Copyrights").

27.     Novartis is also an essential party to Alcon's Eighth, Ninth, and Tenth causes of action because Novartis was the owner of the Novartis Marks and the Novartis Copyrights at the time this lawsuit was filed and the underlying decisions were made and, therefore, had the right to control, and on information and belief, did control the nature and quality of the goods Alcon produces using the Novartis Marks and the Novartis Copyrights.

28.     The control exercised by Novartis over its former subsidiary Alcon includes, but is not limited to, allowing Alcon to falsely claim certain products can be prescribed in the United States, when they cannot, and falsely claim certain products meet the criteria for use in the European Union, when they do not.

29.     The control exercised by Novartis further allowed Alcon to falsely to claim that certain products bearing the American flag are made in America and are superior to products which do not bear the American flag, when they are not.

30.     Because Novartis had control and has benefitted financially, it is liable for Alcon's acts, and must disgorge the profits made by these unlawful activities.

31.     This Court has subject-matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 (Lanham Act), 28 U.S.C. § 1331 (federal-question jurisdiction), 28 U.S.C. § 1338(a) (trademark-related Acts of Congress), and 28 U.S.C. § 1367 (supplemental jurisdiction).

32.     This Court has jurisdiction over Lens.com's counterclaims under Rule 13(a) (compulsory counterclaims), Rule 13(b) and 28 U.S.C. § 1367 (supplemental jurisdiction over counterclaims that are factually connected to the plaintiff's claims), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. 1337 (antitrust-related Acts of Congress).

33.     This Court has concluded that Lens.com is subject to personal jurisdiction in this State and in this District and venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Jurisdiction and venue are also proper under 15 U.S.C. § 22, as Alcon conducts substantial business in this District and Novartis previously owned trademarks and copyrights which are extensively distributed in this District.

34.     Lens.com has filed this Second Amended Answer, Defenses, and Counterclaim pursuant to direction from this Court, and the counterclaims presented here now relate only to

38

this action in the Federal District Court for the Eastern District of New York. The two claims that have been transferred to the Middle District of Florida at the direction of the Judicial Panel on Multidistrict Litigation are, thus, not included in this pleading. If and when those claims return (for trial or otherwise) before this Court, Lens.com will file a consolidated pleading.

35.     Because the Middle District of Florida Court has not directed Lens.com to amend those claims (Claims 3 and 4), Lens.com has not done so. To the extent there is a difference between the allegations in the First Amended Answer, Defenses, and Counterclaims and the Second Amended Answer, Defenses, and Counterclaims, the First will govern in the MDL proceedings in the Middle District of Florida and the Second will govern in this action.

**B.     The Contact Lens Market**

36.     The relevant geographic market for contact lenses is the United States.

37.     As for relevant product markets, prescriptions erect walls between brands and types of contact lenses, meaning that there is an unusually low cross-elasticity of demand between contact-lens types.

38.     Once an ECP writes a prescription for a particular brand and type of lens, a consumer buying from a non-ECP Retailer cannot substitute one brand or type of contact lens for another without a new prescription. The lens prescribed by the ECP becomes the only lens that can be sold to that consumer.

39.     In practical terms, even very similar contact lenses are perfectly inelastic from a consumer's perspective—once a lens is prescribed, the consumer cannot switch to another lens without a new prescription, even if "competing" lenses were to significantly decrease in price

40.     Each brand and type of contact lens, therefore, constitutes its own product market. Alcon's DAILIES AQUACOMFORT PLUS lenses are one product market, for example, while Alcon's AIR OPTIX PLUS HYDRAGLYDE lenses are another.

41.     In the alternative, a second relevant product market is the "market for disposable contact lenses"—a market that is highly coordinated and, thus, concentrated at the manufacturer, distributor, and retailer levels, and barriers to entry to this market are high and increasing.

**C.      Agreements at Issue**

42.     Alcon has engaged in two distinct strategies to combat price discounting on its lenses: (1) a Manufacturers' UPP strategy, and (2) Alcon's packaging strategy. Both strategies are based on agreements between two or more entities designed to achieve an unlawful, anticompetitive objective. (As described in more detail in the sections below, both of these strategies also include multiple types of unlawful anticompetitive conduct, including minimum pricing or price fixing, group boycotts, exclusive dealing, and tying arrangements.)

43.     The first type of agreements at issue are Retailer–Manufacturer Agreements, in which Retailers (including ECPs) agree to prescribe and/or sell Alcon lenses in return for ████████████████████████████████████████████████████ ███████ These are, for antitrust purposes, vertical agreements. Upon information and belief, Alcon uses a specific version of Retailer–Manufacturer Agreement for retailers like Lens.com who sell contact lenses on the internet.

44.     The second type of agreements at issue are Manufacturer–Distributor Agreements, in which Alcon agrees to make a Distributor ███████████████████████ ████████████████████████████████████████████████████

█████████ For antitrust purposes, these agreements may properly be characterized as either vertical agreements or horizontal agreements or both.[4]

45.     The third type of agreements at issue are inter-Manufacturer Agreements regarding UPPs: agreements between Manufacturers to impose, implement, and enforce UPPs designed to ██████████████ by making discount retailers like Lens.com unable to offer discounts on contact lenses.

### D.     Contact-Lens Industry Mechanics and the Intent of the Agreements at Issue

46.     While it is contact-lens *wearers* who purchase lenses, it is ECPs—eye-care providers like optometrists and ophthalmologists—who actually make the decision about what brand of lenses a patient–consumer will ultimately purchase.

47.     By contrast, an ECP can use its control over a prescription to steer a patient to its own retail channel, and many ECPs primarily fit a single manufacturer. By winning the allegiance of an ECP, then, a Manufacturer effectively "captures" that ECP's patient base.

48.     One 2015 analysis found that contact lens materials generated 16% of the total gross revenue for the average independent optometric practice. That same study found that, on average, each contact-lens eye exam generates $152 in annual contact-lens sales for the practice, at a gross profit margin for ECPs of 46%.

49.     Roughly two-thirds of retail sales of contact lenses are made by ECPs serving the dual role of both deciding what lens a patient/consumer will buy and then selling it to them.

---

[4] In some cases, lenses may pass from Manufacturer to Distributor to Retailer to customer. In those situations, an agreement between Manufacturer and Distributor should be characterized as a vertical agreement. However, in other cases a Manufacturer may offer to deal directly to a Retailer—as Alcon has at times with Lens.com—and in that case the Manufacturer and its Distributors are operating at the same "level," making an agreement between Manufacturer and Distributor a horizontal agreement.

50.     Because contact-lens prescriptions are typically brand-specific, an ECP's decision of which lens to prescribe effectively "locks in" a consumer to a specific brand.

51.     As an alternative to buying contact lenses from an ECP, contact-lens consumers can buy lenses through several alternative channels, including brick-and-mortar retailers like Costco and online retailers like Lens.com.

52.     But even if a contact-lens consumer opts to buy lenses through an alternative channel, the product to be purchased is in the control of the prescribing ECP.

53.      The higher the potential profit margins on a sale of Alcon lenses, the more willing an ECP is to prescribe—or "fit"—an Alcon lens.  As such, as a contact-lens manufacturer, Alcon is eager to please ECPs, as ECPs who are happy with Alcon are more likely to prescribe Alcon lenses than those of another manufacturer increasing Alcon's sales and market share.

54.     Moreover, if all Retailers sell a particular lens at roughly the same artificially high price, profit margins increase significantly.  In an effort to maximize profits, Retailers prefer to buy from Distributors who are viewed as ███████████████   In order to persuade ECPs to prescribe their lenses, ████████████████████████████████████████████████ ████████████████████████████████

55.     Studies of the contact-lens market have found that ECP Retailers consistently charge higher prices for identical lenses than their non-ECP competitors. A 2004 FTC report, for example, sampled pricing for three lens types—Alcon Focus Toric lenses, Alcon FreshLook lenses, and J&J Acuvue 2 lenses—and found that for each lens type, ECP Retailers charged 25% to 28% more than non-ECP Retailers.

56.     In a July 2018 sampling, for example, the listed sale price for a 90-pack of Alcon DAILIES AQUACOMFORT PLUS lenses was $44.93 at Costco, $52.50 at Wal-Mart, $58.65 at Lenscrafters, $60.99 at Walgreens, and $64.99 at 1-800 Contacts. The listed sale price of those same lenses at Lens.com was $29.94.

57.     In the same July 2018 sampling, the listed sale price for a 6-pack of AIR OPTIX PLUS HYDRAGLYDE lenses was $42.63 at Costco, $48.69 at Wal-Mart, $52.99 at Walgreens, $54.99 at 1-800 Contacts, and $58.50 at Lenscrafters. The listed sale price of those same lenses at Lens.com was $37.95.

58.     Non-discounting Retailers (and particularly ECPs) have focused on excluding discounting competitors from the market.

**E.     Lens.com's Competitive Advantages and Its Antitrust Injury**

59.     Like other Retailers, Lens.com sells lenses in the original, unopened boxes and/or vials packaged by Manufacturers.

60.     Its primary competitive advantages are price and convenience.

61.     And because Lens.com sells contact lenses online, purchasing lenses from Lens.com is typically more convenient than purchasing lenses from an ECP or a brick-and-mortar retailer.

62.     Companies like Alcon refer to Lens.com as a "gray market seller," but Lens.com is more properly characterized as a discounting Retailer.

63.     As a discounting Retailer, Lens.com has suffered a competitive injury flowing from the exact anticompetitive conduct that makes Alcon's conduct unlawful, and the competitive injury Lens.com has suffered is precisely the type of harm that antitrust laws are intended to prevent.

43

64.     Alcon's actions not only undermine competition and harm end consumers—contact-lens wearers—but also harm Lens.com by, among other things, causing Lens.com to lose sales, eliminating competition at the U.S. Distributor level and, thus, either increasing distributor-level prices or foreclosing entire distribution channels, delegitimizing its business, harming its goodwill with customers, and forcing it to defend itself against baseless pre-textual claims of trademark infringement.

65.     As a discounting Retailer, Lens.com is within the area of the economy that is endangered by a breakdown in competitive conditions in the contact-lens industry.

66.     The Alcon actions described herein have the purpose of increasing prices. Alcon's actions lack business justification and, to the extent Alcon has even attempted to articulate a pro-competitive justification, those justifications are pre-textual.

67.     Lens.com has suffered antitrust injury as a direct result of Alcon's actions, and will continue to suffer antitrust injury unless the court intervenes. Lens.com's losses arising from Alcon's actions are discrete, quantifiable, and non-duplicative, and would not have arisen absent Alcon's anticompetitive conduct.

68.     Lens.com is also an "efficient enforcer" and will "efficiently vindicate the goals of antitrust law" by, among other things, enforcing judgment against Alcon.

## V.     Alcon's Anti-Competitive Conduct Targeting Lens.com

### A.     Design of Alcon's UPPs ███████████████

69.     ████████████████████████████████████

████████

70.     ████████████████████████████████████

████████████████████████████████████████

71. ███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

72. ███████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████

73. ████████████████████████████████████

██████████████████████████████████████

███████

74. ████████████████████████████████████

███████████████████████████████████

██████████████████

75. ████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

█████████████████████

76. ████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████

77. ████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

█████████████

**B. Alcon's Implementation of UPPs**

████ Alcon's plans for a price-fixing initiative required agreement both from Retailers, who would need to commit to selling Alcon lenses at the agreed-upon price, and from Distributors, ████████████████████████████████████████ ████████

79.    Alcon's UPP on its DT1 lenses, ████████████████, was announced in June 2013. UPPs on other Alcon lenses followed, and UPPs were eventually applied to at least four Alcon lenses—Dailies Total 1, Dailies Total 1 Multifocal, Dailies AquaComfort Plus Multifocal, and Dailies AquaComfort Plus Toric,

80.    Alcon understood that ECPs were satisfied with Alcon's DT1 UPP, which Alcon deemed a success.

81.    After Alcon implemented its DT1 UPP, ECPs urged Alcon to expand their UPPs to other lenses.

**C.    Alcon's Agreement with Other Manufacturers Regarding UPPs**

82.    Shortly after Alcon introduced its UPPs, other Manufacturers began to do the same.

83.    Before June 2013, each of the Manufacturers permitted retailers to determine the prices at which they would sell their contact lenses and permitted discounting.

84.    After June 2013, the Manufacturers began implementing UPPs and preventing retailers from selling certain lines of contact lenses below mandated prices.

85.    This parallel change in pricing model would not have occurred in the absence of an agreement among the Manufacturers.

86.     The mechanics of other Manufacturers' adoption of UPPs mirrored Alcon's: ECPs, seeking to avoid price competition by Online Discounters, "express[ed] concern about the discounts offered by online retailers," then Manufacturers worked with Distributors, including ABB, to "impose minimum resale prices on certain contact lens lines" through UPPs, "thereby reducing or eliminating competition on those products" from discounting Retailers like Lens.com.

87.     Manufacturers' adoption of UPPs was directly contrary to their independent economic self-interest, which is to lower retail prices for contact lenses and increase sales.

88.     It would have been particularly contrary to a Manufacturer's independent economic self-interest to implement a UPP without assurance that competing Manufacturers would follow suit.

89.     Within a 15-month period, each of the Manufacturers implemented UPPs despite their use being against their independent economic self-interest.

90.     Manufacturers, Distributors, and ECPs expected the coordinated implementation of minimum pricing policies—coupled with any needed boycotts of discounting Retailers—to significant increase profits. By way of example:

a.     Alcon Vice President Jim Murphy described Alcon's UPP as "a win" for the manufacturers, for doctors, and (supposedly) for consumers.

b.     In a June 2014 article published in the *Review of Cornea & Contact Lenses*, Gary Gerber, an influential independent ECP, explained the goal of UPPs was to eliminate price competition. Gerber assured readers that under UPPs, "volume discounts for large practices and online retailers go away" and that ECPs would no longer suffer patient losses that could "be attributed to price competition."

c.     Gerber's June 2014 article also explained:

47

Manufacturers employing UPP have the ability to "cut off" a doctor who does not abide by their pricing policy. Some practitioners question the ability and willingness of manufacturers to enforce these rules. To date, I'm aware of several instances where a manufacturer with a UPP has prohibited an online vendor from selling below the UPP. The hope is that all manufacturers with UPP lenses will follow suit, should other resellers not play by the rules.

91.     The Manufacturers had opportunity (and did in fact) conspire and exchange information, including through their membership in groups like the Contact Lens Manufacturers' Association ("CLMA") the Contact Lens Institute ("CLI"), through which the Manufacturers had regular opportunities to meet, exchange information, and signal their intentions to one another.

92.     The Manufacturers' close relationships with non-discounting Retailers (including ECPs) and with Distributors like ABB also enabled collaboration with ECPs and with each other to develop the UPPs.[5]

93.     With UPPs in place, Alcon began to increase prices.

**D.     Alcon's Effort to Bring Lens.com** ██████

94.     Beginning at least as early as 2012, Alcon proposed that Lens.com purchase Alcon lenses directly from Alcon, but has conditioned that direct purchase relationship on Lens.com agreeing to restrictive terms, including the requirement that Lens.com not purchase Alcon lenses from any other source (i.e., an exclusive dealing arrangement).

95.     Lens.com has consistently refused to sign such agreements.

---

[5] In the MDL into which Lens.com's UPP claims have been consolidated, the Manufacturer Defendants moved to dismiss the class plaintiffs' claims, arguing that the class plaintiffs had "alleged no specific facts which support an inference of agreement between the Manufacturer Defendants, ABB, and the ECPs." *See MDL 2626 Order*, Dkt. No. 243 at *17. The court denied that motion in June 2016, concluding that the direct evidence presented by plaintiffs, as well as "plus factors" and the context of defendants' conduct, made plausible the plaintiffs' allegations of "an illegal horizontal agreement among the Manufacturer Defendants" and of a "conscious commitment" by Manufacturers and Distributors "to a common scheme to achieve an unlawful objective." *Id* at *40.

96.     Alcon intensified its efforts to ████████████████████ ████████████████████████████████████████████ ██████████████████████.

97.     In September 2013, Alcon presented Lens.com with a draft agreement—████████ ████████████████████████████████████████████ ███████████████████████████████.

98.     Lens.com did not sign that draft agreement.

99.     Around October 2014, Alcon again pressed Lens.com to ████████████ by signing an agreement with Alcon.

100.    Lens.com once again pushed back on the terms of that agreement, including its requirement that Lens.com not purchase Alcon lenses from any source not "pre-approved" by Alcon.

101.    In an October 2014 email, Alcon told Lens.com that there was ████████████████ ████████████.

102.    In response to complaints from ██████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ████████████.

**E.      Alcon's Initiation of a Group Boycott**

103.    ████████████████████████████████████████████████ ████████████████████████████████████████.

104.    ████████████████████████████████████ ████████████████████████████████████████████.

[redacted]

105. [redacted]

106. [redacted]

107. [redacted]

108. [redacted]

109. [redacted].

110. [redacted]

111. [redacted]

112. [redacted]

113. 

114.

115.

116.

117.

118.     That group boycott caused immediate, significant competitive injury, including injury to Lens.com, and continues to do so today.

119.     As a result of the group boycott instituted by Alcon, Lens.com is frequently unable to obtain all of the contact lenses it needs and for which there is consumer demand.

120.     As a consequence, Lens.com has suffered significant damages from lost sales, as Lens.com has not been able to consistently obtain all of the Alcon contact lens products it could have sold.

121.     In addition to Alcon's refusal to supply contact lenses directly to Lens.com and its instruction to its U.S. distributors to not sell contact lenses to Lens.com, Alcon and its conspirators also began a campaign of disinformation designed to assert that contact lenses purchased from Lens.com and other online distributors were unsafe.

122.    Lens.com's injury to its business and its property, therefore, includes lost sales from its inability to maintain a full product line, elimination of competition at the Distributor level (thus either increasing distributor-level prices charged to Lens.com or foreclosing entire distribution channels), damage to its reputation, lost customer goodwill, and other costs associated unreliable and unpredictable supply of lenses.

**F.    The End of Alcon's UPP**

123.    In 2015, following the Manufacturers' adoption of UPPs, Utah enacted a statute that prohibited contact-lens manufacturers from "tak[ing] any action, by agreement, unilaterally, or otherwise, that has the effect of fixing or otherwise controlling the price that a contact lens retailer charges or advertises for contact lenses."

124.    In the meantime, the Maryland Attorney General filed suit against J&J in 2016, seeking to enforce a Maryland statute barring agreements that set "a minimum price below which a retailer, wholesaler, or distributor may not sell a commodity or service." In March 2017, before any substantive rulings issued in that case, the court accepted an "assurance of discontinuance" under which J&J agreed not to enter into any minimum-retail-price agreements covering sales in Maryland.

125.    In the face of pushback from litigants and lawmakers, Alcon and the other Manufacturers announced the discontinuation of their UPPs.

126.    But the group boycott of Lens.com, remains in place today, and Lens.com continues to suffer competitive injury as a result of that group boycott

**G.**    ████████████████████████████████████████

127.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

███████████████

128.   ██████████████████████████

██████████████

129.   ██████████████████████████

████████████████████

130.   █████████████████████████

███████████████

131.   ██████████████████████████

████████████████████████████

██████████████

**H.     Development and Implementation of Alcon's Packaging Strategy** ██████
██████

132.   ████████████████████

█████████████████████████████

█████████████████████████████

████████████████████████

███████████████████████████

██████████████████████████

█████████████████████████

██████████

███████████████████████████

█████████████████████████████

I.     **Alcon's Creation of Tying Products**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

148.     Finally, in early 2018, shortly before it filed this lawsuit, Alcon created a "U.S.-only" version for one product called DAILIES AQUACOMFORT PLUS lenses ("Plus Lenses").

149.     Since then, Alcon has also created a "U.S.-only" version of another product called AIR OPTIX PLUS HYDRAGLYDE lenses ("Optix Lenses"). Below, this Counterclaim refers to these lenses—Alcon's Plus Lenses and its Optix Lenses—collectively as the "Tying Products."

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████

151.     The packaging changes Alcon instituted are immaterial. As the ultimate result of its initiatives regarding packaging changes, Alcon added, in fine print, references to a helpline and a brand-specific website, placed product instructions on the outside of the packaging (instead

of inside the packaging, as it had with prior packaging), added an American flag icon in the corner of the packaging, and—for one lens type—added an additional logo and product lot number.

152.    Lens.com believes and is informed that the lenses contained in Alcon's new packaging are identical to—or at least indistinguishable from—lenses contained in Alcon's old packaging.

153.    These superficial changes have no material effect on Alcon's ability to control the quality of its contact lenses. In fact, for months after it first began shipping lenses in the new packaging, Alcon allowed distributors and retailers to continue to sell product in the old packaging, as part of a "run off" of old inventory.

154.    Alcon also continues to sell some contact lenses to consumers in the United States in the exact same packaging that it now claims is unsafe and harmful to consumers.

| Older "Unsafe" Packaged Dailies AquaComfort Plus Contact Lenses | Current "Safe" Dailies AquaComfort Plus Toric Contact Lenses |
|---|---|





155.    Alcon has promoted these changes to non-discounting Retailers (including ECPs)

███████████████████████████████████████████████████

156.    Alcon did not institute these purported "quality control" measures with the dozens of other lens products sold by Alcon, even though Alcon claims that these measures are essential for promoting health and safety for contact-lens wearers.

157.    Rather than signifying any difference in the enclosed lenses, Alcon's new packaging is intended to aid Alcon in ████████████████████████████████████

████████████

**J.    Alcon's Ongoing Enforcement of the Lens.com Boycott and Its Attempt to Use The Boycott and Its Packaging Changes to Force Lens.com to Abandon Discounting**

158.    Even as packaging changes were being considered, Alcon remained hopeful that it could persuade Lens.com to cease discounting and increase its prices to match those of non-discounting Retailers.

159.    Though Alcon occasionally considered establishing a relationship with Lens.com, the group boycott Alcon instituted in 2014 remained in place, and Lens.com remained on ███████████████.

160.    Lens.com has repeatedly attempted to purchase products from ABB and other authorized Distributors of Alcon products and failed.

161.    Lens.com has set up dummy accounts and engaged in other efforts to purchase products from these Distributors. Eventually these efforts are discovered and the source of supply is eliminated.

162.    This coordinated conspiracy constitutes a group boycott and a concerted effort by Alcon and U.S. Distributors ████████████ to affirmatively prevent Lens.com from purchasing Alcon lenses.

**K.    Alcon Attempts to Force Lens.com to Buy *All* Alcon Lenses from Alcon.**

163.    Since creating the Tying Products, Alcon has made it clear that it will only sell the Tying Products to Lens.com in connection with an agreement requiring Lens.com also to purchase all products exclusively from Alcon in the United States.

164.    Alcon provided Lens.com with prices for all of its products. Lens.com is informed and believes that the prices offered to it by Alcon are substantially higher than the prices Alcon charges distributors and retailers outside the USA for the exact same Tied and Tying Products.

165.    In January 2018, Lens.com's CEO met directly with an Alcon executive sales director and another Alcon employee to discuss an Alcon proposal under which Lens.com would be ████████████████████████████ and be allowed to purchase Alcon lenses directly from Alcon.

166.    On January 29, 2018, Alcon provided Lens.com with details on "pricing" and "terms," including express requirements that "100% of all [Lens.com] purchases [would be] direct from Alcon" and that Lens.com would report to Alcon its "monthly consumption data," including sales by product and by dollar. Alcon asked that Lens.com "provide . . . an update as to [its] position on the offer no later than Monday, February 5th."

167.    When negotiations between the two parties stalled, Alcon served this trademark-infringement lawsuit.

168.    In its lawsuit, Alcon is using the trademarks found on the Tying Products as an instrument to require Lens.com to purchase all Tied Products exclusively from Alcon, ███

████████████████████████████████████████████████████████

169.    Shortly after filing suit, Alcon immediately publicized these lawsuits with ECPs and informed ECPs that this lawsuit would show Alcon is committed to placing ECPs and their practice "first" and, further, promoted that ECPs could "prescribe [Alcon lenses] with confidence," because Alcon had ramped up efforts to exclude discounting Retailers from the marketplace.

170.     Alcon has used coercive efforts, including this lawsuit, to force Lens.com to purchase all of its products – not just those on which it claims trademark infringement – only from Alcon.

171.    More recently, Lens.com learned that there were alleged counterfeit Air Optix Night and Day products in the market. In order to protect consumers, Lens.com asked Alcon if it could purchase Air Optix Night and Day products directly from Alcon, to insure that Lens.com was not purchasing allegedly counterfeit products.[7]

---

[7] ████████████████████████████████████████████████████████

172.    Alcon refused to sell Night and Day products to Lens.com—unless Lens.com purchased all of its products from Alcon.

173.    Alcon is attempting to use its market power over the Tying Products to force Lens.com to purchase all of the Tied Products from Alcon only.

174.    Given the near-total control that Alcon and its approved Distributors have over the market or distribution of Alcon lenses, Alcon has sufficient market power in the Tying Products market to coerce Lens.com to accept its financial terms.

**L.    Alcon's False Advertising Stemming from Its Packaging Changes**

175.    On or about February 23, 2018, Alcon served Lens.com with a series of documents, including sworn statements, provided under oath by two Alcon employees named David Dowd ("Dowd") and Michael Wangsness ("Wangsness").

176.    In these sworn declarations, Alcon makes clear that it promotes and advertises its products on the premise that all of its products meet the highest quality and regulatory requirements available anywhere in the world.  For example, Wangsness acknowledges that: "It is illegal for us to sell in the United States any contact lens that is either not registered with the FDA or does not meet the specification in our FDA registration for that product."

177.    The alleged quality control measures used by Alcon are reflected on its packaging and promotional literature via the use of certain symbols, statements and phrases Alcon places on its packaging and product literature to assure all retailers and consumers that Alcon products are safe and satisfy world-wide regulatory requirements.

178.    As part of this process Lens.com is informed and believes that all Alcon packaging used everywhere in the world contain an "Rx Only" symbol.

179.    According to Alcon's own product inserts, the "Rx Only" symbol means "CAUTION: Federal (United States) law restricts this device to sale by or on the order of a licensed eye care professional."

180.    The "Rx Only" symbol, thus, assures Lens.com and all consumers who purchase Alcon lenses anywhere in the world that all of Alcon's products can be prescribed in the United States and comply with all relevant FDA and all other U.S. regulations applicable to such products.

181.    Similarly, Lens.com is informed and believes that all Alcon packaging used for, at least, the Dailies AquaComfort Plus products contains a "For USA" phrase as follows: "For USA: Request Package Insert for Clinical Details".

182.    This "For USA" phrase assures Lens.com and all consumers who purchase Alcon contact lenses anywhere in the world that, at least, the Dailies AquaComfort Plus products can be sold in the United States and comply with all relevant FDA and other U.S. regulations required for products to be sold in the United States.

183.    Alcon's products also contain other markings, such as "®,"  "TM," and "©," which are relevant only in the United States and demonstrate Alcon products bearing these symbols are authorized to be sold in the United States and that Alcon knows such products are and will be sold in the United States.

184.    Alcon also promotes the sale of its products through the use of promotional and safety literature which also contain statements which inform consumers that all Alcon products are safe and meet all criteria for sale in the United States.

185.    Collectively these symbols, phrases and statements shall hereafter be referred as "U.S. Symbols and Statements."

186.    Similarly, upon information and belief, all of Alcon's contact lenses product packaging have a "CE" symbol, including those that are allegedly only intended for sale in the United States.

187.    The "CE" symbol, according to Alcon's own package inserts, is the European Conformity sign which is commonly understood to mean that the product containing the CE mark complies with the relevant European Union legislation.

188.    Alcon places the "CE" symbol on all of its products, including those allegedly for sale only in the United States, to assure all of its customers, everywhere in the world, that all of Alcon products, wherever sold, also meet the regulatory and safety standards of the European Union.

189.    Despite the claims regarding safety found on every box of lenses sold everywhere in the world, Alcon's employees assert that some Alcon customers outside the United States receive inferior products, which do not meet the safety levels of products Alcon sells in the United States.

190.    For example, Wangsness has testified that: "Due to different regulatory requirements imposed by the U.S. Food & Drug Administration, there are tighter quality control standards for many Alcon contact lens products sold in the United States than for comparable Alcon contact lens products sold outside of the United States."

191.    Wangsness further testifies that: "When we find that contact lenses that do not meet the applicable FDA standards still meet the regulatory standards outside of the United States, we segregate them in our inventory management system for distribution outside of the United States. Because we cannot sell products that do not meet FDA standards in the United States, we are careful not to distribute these lenses in the United States."

192.   Wangsness also testifies and claims that: "Alcon does not test or inspect contact lenses to meet FDA standards if it is not selling those products in the United States, which is the case with the O2 OPTIX® lenses that Alcon discontinued selling in the United States in 2013 . . . ."

193.   Dowd has claimed that: "When contact lens products that do not meet FDA standards do meet regulatory standards elsewhere, we segregate them in our distribution and supply chain system to ensure that they are distributed only outside the United States. The percentage of such segregated lenses in our supply chain at any given point in time varies but it can be significant."

194.   With respect to O2 Optix lenses, Dowd testifies that: "As for our O2 OPTIX® lenses, we do not test them against the applicable FDA regulations because we no longer distribute them in the United States. Accordingly, all O2 OPTIX® lenses are segregated for distribution outside the United States in our distribution and supply chain system."

195.   Dowd also claims that: "Because a significant percentage of Alcon lenses that are sold outside the United States have not been confirmed to be FDA-compliant, we have no doubt that Lens.com is selling significant numbers of non-FDA-compliant Alcon lenses in the United States, even though they have not been approved for sale in the United States by the FDA."

196.   Lens.com is informed and believes that Alcon's statements regarding regulatory compliance are false and misleading because Alcon has placed symbols on all of its contact lens packaging denoting the fact that all of its lenses sold everywhere in the world are compliant with both the regulatory requirements of the United States and the European Union.

197.    Their statements are also inconsistent with █████████████████

███████████████████████████████████████████████

████████████████████████████████████████

198.    Alcon documents further note that ███████████████████

█████████████████████████████████████████████████████

██████████████

199.    Lens.com is furthered informed and believes that the allegations referenced in the above paragraphs do not reflect actual noncompliance with FDA regulations but instead have been raised as pre-textual reasons to preclude Lens.com and others from purchasing contact lens products on the gray market.

200.    For more than 20 years, Alcon has been well aware that Lens.com and numerous other suppliers in the United States have imported contact lenses from abroad which contain or which are promoted using U.S. Symbols and Statements and/or the "CE" symbol.

201.    Despite this knowledge, for more than 20 years Alcon has taken no steps to inform Lens.com or any other retailers or consumers that products containing or referencing U.S. Symbols and Statements and/or the "CE" symbol were not in fact FDA compliant.

202.    In fact, however, Lens.com believes that all products Alcon sells everywhere in the world, which are promoted with U.S. Symbols and Statements, are in fact FDA compliant and that Alcon has raised the issues described in the declaration testimony above as a pretext and as part of its unfair and monopolistic business practices and that such have been raised in an effort to raise prices of consumers by forcing them to purchase only contact lenses which Alcon distributes for sale in the United States.

203.    If, however, the statements contained in the noted above declarations are true and some portion of Alcon's contact lens products do not meet standards applicable to lenses sold in the United States and the European Union then Alcon's product packaging is false and Alcon has engaged in a pattern of false advertising, which must be corrected.

204.    Lens.com further avers that it has been damaged by Alcon's statements (if true) in amounts to be proven at trial and that Alcon should also disgorge all profits derived from its false advertising.

### i.    Alcon's Misleading Use of the American Flag

205.    In addition to its apparent misleading use of U.S. Symbols and Statements and "CE" symbol, Alcon has also placed the American flag on certain Plus Lenses and Optix Lenses.

206.    The prominent use of the American flag on these products falsely conveys the notion that all contact lens products displaying the American flag are "made in America," which is not the case.

207.    Alcon's prominent use of the American flag also falsely conveys that the identical contact lenses sold by Lens.com with packaging which does not depict the American flag are of inferior quality, when in fact they are identical in quality.

208.    Alcon's prominent use of the American flag also falsely conveys that only Alcon brand contact lenses bearing the American flag on the product packaging are legal and permitted for sale within the United States and that the identical contact lenses in other product packaging without the American flag are not legal or permitted for sale.

**FIRST CAUSE OF ACTION**
***Per Se* Violation** of Sherman Act § 1, Clayton Act § 15, and Donnelly Act § 340 *et seq.*
**Anticompetitive Conduct Related to Alcon's Packaging Strategy**
**(Alcon)**

209.    Lens.com incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

210.    Beginning at least as early as 2012 and continuing to the present, Alcon, its Distributors, and its non-discounting Retailers (including ECPs) have conspired to restrain trade by using a ███████████████████████████████████████████████████████

███████████████████████████

211.    That packaging strategy began with an agreement between non-discounting Retailers and Alcon, █████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████ thus shielding the non-discounting Retailers from price competition.

212.    At least three times in the past seven years—████████████████████████

██████████████—Alcon has presented Lens.com with a draft agreement under which Lens.com could purchase Alcon lenses directly from Alcon. The agreements Alcon proposed contained exclusive-dealing clauses, under which Lens.com would have been prevented from obtaining Alcon lenses from any other source. The agreements Alcon proposed also contained tying clauses, under which Lens.com's ability to purchase certain Alcon lenses was conditioned on Lens.com purchasing *all types* of Alcon lenses directly from Alcon. Lens.com declined to sign the agreements Alcon presented.

213.    Alcon has entered into agreements with its ███████████████████

████████████████████████████████████████████████

█████████████████████████

214.    In October 2014, █████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████ That group

boycott remains in place today.

215.    Because Alcon itself acts as a distributor of Alcon lenses, this group boycott in

which Alcon and other Alcon Distributors engaged can be characterized as both a vertical and a

horizontal conspiracy.

216.    The group boycott of Lens.com is facilitated at least in part by ████████████

████████████████████████████████████████████████

████████████████

217.    In late 2015 and early 2016, ██████████████████████████

████████████████████████████████████████████████

█████████████████████████████ redesigned to add elements including

patient instructions, an Alcon phone number and website address, and graphical elements,

including a United States flag.

218.    Alcon's motivation in instituting packaging changes ████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████

219.     After announcing and implementing its packaging changes, Alcon filed suit against Lens.com. Contrary to the allegations of Alcon's Complaint and its other filings in this action, Alcon did not file suit to promote patient safety or to protect its goodwill. Rather, Alcon filed this action against Lens.com ████████████████████████████████████████ ████████████████████████████████████████████

220.     This conspiracy between Alcon, its Distributors, and its non-discounting Retailers (including ECPs) constitutes an agreement in restraint of trade that is *per se* illegal. Though many federal antitrust claims are examined under the Rule of Reason, conspiracies that involve group boycotts and tying arrangements are considered *per se* violations of federal antitrust law.

221.     The conspiracy between Alcon, its Distributors, and its non-discounting Retailers is intended to reduce competition and increase prices in the United States market for retail sales of each of Alcon's lenses. The conspiracy has already succeeded in reducing competition and increasing prices on Alcon lenses, and will do so further if the conspiracy is allowed to continue.

222.     As a result of the conduct of Alcon and its co-conspirators, Lens.com has suffered injury to its business and property that includes, among other things, lost sales, the elimination of competition at the Distributor level (thus either increasing distributor-level prices or foreclosing entire distribution channels), delegitimization of Lens.com's business, harm to its goodwill with customers, and costs and efforts associated with defending itself against baseless pre-textual claims of trademark infringement.

223.     With respect to this claim under Section 1 of the Sherman Act and related state and federal statutes, Lens.com seeks injunctive relief, treble damages, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**Rule of Reason Violation of Sherman Act § 1, Clayton Act § 15,**
**and Donnelly Act § 340 *et seq.***
**Anticompetitive Conduct Related to Alcon's Packaging Strategy**
**(Alcon)**

224.    Lens.com incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

225.    As an alternative to Lens.com's claims for *per se* violations of federal and state antitrust laws, Lens.com also alleges antitrust claims under the Rule of Reason.

226.    The relevant geographic market for purposes of this claim is the United States.

227.    As stated above in Paragraphs 36-41, because prescriptions erect walls between brands and types of contact lenses, there is an unusually low cross-elasticity of demand between contact-lens types. Even very similar contact lenses are perfectly inelastic from a consumer's perspective, as once a lens is prescribed, the consumer cannot switch to another lens without a new prescription, even if "competing" lenses were to significantly decrease in price. The relevant product markets are, thus, distinct markets for each brand and type of Alcon contact lens sold in the United States ("Individual Alcon Lens Markets").[8]

228.    These markets, taken together, make up the retail market for the sale of Alcon disposable contact lenses ("Alcon Lens Market").

229.    All levels of the relevant product market are highly concentrated. Upon information and belief, authorized Alcon Distributors ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ among authorized Alcon

---

[8] In denying a motion to dismiss an antitrust action brought by Costco against Manufacturers and ABB, the Federal District Court for the Middle District of Florida recognized that each lens type produced by each Manufacturer can constitute a discrete product market for antitrust purposes.

Distributors. And at the retail level, the cartel of non-discounting Retailers account for a significant majority of contact-lens sales for each individual Alcon lens type, with ECPs alone controlling roughly two-thirds of the retail market.

230.    As described above in Paragraphs 103-22, 142-74, Alcon, its Distributors, and its non-discounting Retailers engaged in a conspiracy and entered into agreements that constitute an unreasonable restraint of trade in violation of federal and state antitrust laws, including the orchestration of a group boycott of Lens.com and ████████████████████████████ ████████████████████████████████ This web of agreements constitutes a hub-and-spoke conspiracy designed to force Lens.com from the market.

231.    As stated above in Paragraphs 132-141, ███████████████████████████ █████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████

232.    There are no viable pro-competitive justifications for the conduct of Alcon and its co-conspirators described above. Any arguments regarding "patient safety," "prescription verification," or "maintenance of goodwill" are pre-textual, as ████████████████████ ████████████████████. To the extent that Alcon can show pro-competitive effects arising from the conduct described herein, those procompetitive effects are significantly outweighed by anticompetitive effects.

233.    The conspiracy between Alcon, its Distributors, and its non-discounting Retailers is intended to reduce competition and increase prices in the United States market for retail sales

of each of Alcon's lenses. The conspiracy has already succeeded in reducing competition and increasing prices on Alcon lenses, and will do so further if the conspiracy is allowed to continue.

234.    As a result of the conduct of Alcon and its co-conspirators, Lens.com has suffered injury to its business and property that includes, among other things, lost sales, the elimination of competition at the Distributor level (thus either increasing distributor-level prices or foreclosing entire distribution channels), delegitimization of Lens.com's business, harm to its goodwill with customers, and costs and efforts associated with defending itself against baseless pre-textual claims of trademark infringement.

235.    With respect to this claim under Section 1 of the Sherman Act and related state and federal statutes, Lens.com seeks injunctive relief, treble damages, and attorneys' fees and costs.

<div align="center">

**THIRD CAUSE OF ACTION**
***Per Se* Violation of Sherman Act § 1, Clayton Act § 15, and Donnelly Act § 340 *et seq.***
**Anticompetitive Conduct Related to Alcon's UPP Strategy**
**(Alcon)**

**FOURTH CAUSE OF ACTION**
**Rule of Reason Violation of Sherman Act § 1, Clayton Act § 15,**
**and Donnelly Act § 340 *et seq.***
**Anticompetitive Conduct Related to Alcon's UPP Strategy**
**(Alcon)**

</div>

Counterclaims 3 and 4 have been transferred to the Middle District of Florida at the direction of the Judicial Panel on Multidistrict Litigation are, thus, not included in this pleading.[9]

---

[9] If and when these Counterclaims return (for trial or otherwise) before this Court, Lens.com will file a consolidated pleading. Because the Middle District of Florida Court has not directed Lens.com to amend this Counterclaim, Lens.com has not done so. To the extent there is a difference between the allegations in the First Amended Answer, Defenses, and Counterclaims and the Second Amended Answer, Defenses, and Counterclaims, the First will govern in the MDL proceedings in the Middle District of Florida and the Second will govern in this action.

## FIFTH CAUSE OF ACTION
### (Alcon)
### Violation of Sherman Act § 2, Clayton Act § 15, and Donnelly Act § 340 *et seq.*
### (Unlawful Monopolization)

236.    Lens.com incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

237.    Alcon's conduct constitutes the intentional and unlawful maintenance of monopoly power in each Individual Lens Market for Alcon lenses, in violation of Section 2 of the Sherman Act, Section 15 of the Clayton Act, and the Donnelly Act.

238.    Alcon's efforts to maintain monopoly power include the following acts:

(a)    A price-fixing conspiracy implemented through Alcon's adoption of a UPP, ██████████████████████████████████████ ██████████████████████████████████████████ ████████████████

(b)    A group boycott instituted in October 2014, ████████████████ ████████████████████████████████████

(c)    The use of exclusive-dealing agreements, like those contained in the contracts Alcon has presented to Lens.com, under which Alcon's buyers agree to buy Alcon lenses only from Alcon or its authorized distributors;

(d)    Tying arrangements, like those contained in the contracts Alcon has presented to Lens.com, under which Alcon agrees to sell certain monopolized products only if the buyer agrees to buy other Alcon products; and

(e)    The pursuit of baseless "trademark litigation," through which Alcon seeks to prevent Lens.com from selling Alcon lenses that, aside from superficial changes to packaging, are identical to those that Alcon allows to be sold.

239.   Alcon has excluded competitors, including all suppliers and resellers aside from its Authorized Distributors, from each Individual Lens Market for Alcon lenses, depriving Retailers from the benefit of competition among these suppliers or potential suppliers.

240.   This exclusion is intentional: Alcon's goal is to insulate itself from price competition from non-conspiring distributors and to induce non-discounting Retailers to prescribe and/or sell Alcon brands.

241.   Alcon has no legitimate business purpose for its anticompetitive conduct. The claimed benefits, including alleged concerns about patient health and safety, are pre-textual justifications for anticompetitive conduct.

242.   Alcon's anticompetitive conduct is intended to reduce competition and increase prices in the United States market for retail sales of each of Alcon's lenses. This conduct has already succeeded in reducing competition and increasing prices on Alcon lenses, and will do so further if this conduct is allowed to continue.

243.   Alcon's anticompetitive conduct has caused Lens.com to suffer injury to its business and property that includes, among other things, lost sales, the elimination of competition at the Distributor level (thus either increasing distributor-level prices or foreclosing entire distribution channels), delegitimization of Lens.com's business, harm to its goodwill with customers, and costs and efforts associated with defending itself against baseless pre-textual claims of trademark infringement.

244.   With respect to this claim, Lens.com seeks injunctive relief, treble damages, and attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### (Alcon)
### Claim for Violation of Sherman Act (15 U.S.C. § 2), Clayton Act (15 U.S.C. § 15), and Donnelly Act (GBL § 340 *et seq.*)
### (Attempted Monopolization)

245.    Lens.com incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

246.    Alcon has possessed and currently possesses monopoly power over each Individual Lens Market for Alcon lenses in the United States, and barriers to entry in these markets are high.

247.    Alcon has the power to control price and exclude competition in the Individual Lens Markets for Alcon lenses.

248.    Alcon has willfully and wrongfully attempted to maintain monopoly power in the Individual Lens Markets for Alcon lenses, including through the following acts:

(a)    A group boycott, under which Alcon and its authorized distributors, including ABB, refuse to sell Alcon lenses to Lens.com;

(b)    A hub-and-spoke conspiracy, under which ABB, acting on behalf of ECPs, directs the efforts of Alcon and its fellow Manufacturers to adopt policies intended to eliminate price competition in the retail market for contact lenses;

(c)    Exclusive-dealing agreements similar to the agreement Alcon has demanded that Lens.com enter into, under which Alcon's buyers agree to buy Alcon lenses only from Alcon or its authorized distributors;

(d)    Tying arrangements, under which Alcon agrees to sell certain monopolized products only if the buyer agrees to buy other Alcon products; and

249.    The pursuit of baseless "trademark litigation," through which Alcon seeks to prevent Lens.com from selling Alcon lenses which may be lawfully sold in the United States.

Alcon has acted with the specific intent to monopolize the sale of Alcon-brand lenses in each Individual Lens Market for Alcon lenses in the United States, and Alcon has a dangerous probability of success in achieving this goal.

250.    In fact, Alcon has already achieved and/or maintained a dominant position in each Individual Lens Market for Alcon lenses, through its sale of lenses in the U.S. through its authorized distributors.

251.    Alcon has used its monopolistic dominance in these markets to further strengthen its monopolist position, to harm competition, and to unlawfully impede other sellers' access to these markets.

252.    The probable effect of Alcon's exclusionary conduct was—and is—to substantially lessen competition in these markets by excluding all market participants aside from itself and its authorized distributors, thereby foreclosing a substantial share of each Individual Lens Market for Alcon lenses in the United States.

253.    Alcon has no legitimate business purpose for its anticompetitive conduct. The claimed benefits, including alleged concerns about patient health and safety, have long been found to be pre-textual justifications for anticompetitive conduct. And to the extent that Alcon could show a procompetitive effects stemming from its conduct, any procompetitive effects are significantly outweighed by anticompetitive effects.

254.    Alcon's unlawful monopolization is intended to reduce competition and increase prices in the United States market for retail sales of each of Alcon's lenses. This conduct has already succeeded in reducing competition and increasing prices on Alcon lenses, and will do so further if this conduct is allowed to continue.

255.    Alcon's anticompetitive conduct has caused Lens.com to suffer injury to its business and property that includes, among other things, lost sales, the elimination of competition at the Distributor level (thus either increasing distributor-level prices or foreclosing entire distribution channels), delegitimization of Lens.com's business, harm to its goodwill with customers, and costs and efforts associated with defending itself against baseless pre-textual claims of trademark infringement.

256.    With respect to this claim, Lens.com seeks injunctive relief, treble damages, and attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
### (Alcon)
### Claim for Violation of Sherman Act (15 U.S.C. § 1), Clayton Act (15 U.S.C. §§ 14, 15), and Donnelly Act (GBL § 340 *et seq.*)
### (Unlawful Use of Exclusive-Dealing Agreements)

For consistency and clarity, Lens.com's Counterclaim 7 has been folded into Lens.com's other antitrust Counterclaims, as Alcon's unlawful use of exclusive-dealing agreements can most properly be understood within the context of those claims and allegations.

## EIGHTH CAUSE OF ACTION
### (Alcon and Novartis)
### False Advertising and Deceptive Trade Practices Under New York General Business Law §§ 349 and 350

257.    Lens.com incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

258.    For more than 20 years Lens.com has purchased Alcon products from so-called "unauthorized" distributors and/or retailers.

259.    On information and belief, all such products have contained and product literature promoting such products referenced U.S. Symbols and Statements and the "CE" symbol.

260.    The use of the U.S. Symbols and Statements and/or the "CE" symbol leads Lens.com and all other purchasers of Alcon products to reasonably believe that all Alcon products bearing these symbols and statements comply with all FDA regulations and European Union regulations and may be lawfully sold in the United States.

261.    Lens.com in fact believes that all Alcon products bearing or promoted using U.S. Symbols and Statements and/or the "CE" symbol are fully compliant with all FDA regulations and fully compliant with all regulations and laws applicable to contact lenses sold in the European Union.

262.    However, recent statements made by Alcon appear to claim that ████████ █████████████████████████████████████████████████████████████████████ ███████████████

263.    If these statements are true, and Alcon has placed U.S. Symbols and Statements on the label of products and in promotional literature which Alcon claims ███████ ██████ Alcon has knowingly deceived and mislead purchasers of its products, including Lens.com, as to the safety and FDA approval of the contact lenses in a material respect.

264.    Similarly, by placing the "CE" symbol on all of its products, Alcon has also misled Lens.com and others into believing that all products bearing the "CE" symbol comply with all relevant European Union legislation and thus are the highest quality available.

265.    Alcon has also mislead and deceived Lens.com and other purchasers of Alcon products into believing that Alcon products bearing the American flag are made in America and are superior to products which do not bear the American flag.

266.    Alcon is also the owner of the Alcon Copyrights, which it uses to engage in false advertising.

267.     Novartis was the owner of the Novartis Marks, which were, and continued to be, used by Alcon to engage in knowingly and deceitful misconduct.

268.     Novartis was, and may still be, the owner of all the Novartis Copyrights, which appears to provide Novartis with ownership of the packaging used by Alcon to engage in its false advertising.

269.     Novartis's ownership interest in the Novartis Marks and Novartis Copyright required Novartis to exercise control over the nature and quality of goods sold by Alcon.

270.     As a consequence, Novartis is an essential party to this claim and is liable equally with Alcon for the harms caused to Lens.com and consumers.

271.     As a direct and proximate result of Defendants' materially misleading and deceptive conduct, Lens.com suffered and will continue to suffer harm as a result of Defendants' false advertising, including, but not limited to, harm to Lens.com's name, reputation, sales, and goodwill.

272.     Lens.com seeks disgorgement of Defendants' profits, damages, attorneys' fees and costs, injunctive relief, and/or or any such other relief this Court deems appropriate.

## NINTH CAUSE OF ACTION
### (Alcon and Novartis)
### False or Misleading Description or Representation of Fact Under 15 U.S.C. §1125(a)

273.     Lens.com incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

274.     For more than 20 years Lens.com has purchased Alcon products from so-called "unauthorized" distributors and/or retailers.

275.     On information and belief, all such products have been promoted and sold using U.S. Symbols and Statements and other indications that the products are designed and authorized to be sold in the United States.

276.    The use of these U.S. Symbols and Statements and the "CE" Symbol has led Lens.com and all other purchasers of Alcon products to reasonably believe that all Alcon products promoted using these symbols and statements comply with all FDA regulations and all European Union regulations and may be lawfully sold in the United States.

277.    Lens.com in fact believes that all Alcon products bearing these symbols and statements are fully compliant with all FDA regulations and fully compliant with all regulations and laws applicable to contact lenses sold in the European Union.

278.    However, recent statements made by Alcon appear to claim that some Alcon products sold in certain unspecified countries are not compliant with United States and European Union regulations.

279.    If these statements are true, and Alcon has promoted products with these U.S. Symbols and Statements which Alcon claims are not FDA compliant, Alcon has knowingly deceived and mislead purchasers of its products, including Lens.com, as to the safety and FDA approval of the contact lenses in a material respect.

280.    Similarly, by placing the "CE" symbol on all of its products, Alcon has also misled Lens.com and others into believing that all products bearing the "CE" symbol comply with all relevant European Union legislation and, thus, are the highest quality available.

281.    Alcon has also mislead and deceived Lens.com and other purchasers of Alcon products into believing that Alcon products bearing the American flag are made in America and are superior to products which do not bear the American flag.

282.    Alcon is also the owner of the Alcon Copyrights, which it uses to engage in false advertising.

283.    Novartis was the owner of the Novartis Marks, which were, and continue to be, used by Alcon to engage in knowingly and deceitful misconduct.

284.    Novartis was, and may still be, the owner of the Novartis Copyrights, which appear to provide Novartis with ownership of the packaging used by Alcon to engage in its false advertising.

285.    Novartis's ownership interest in the Novartis Marks and Novartis Copyright required Novartis to exercise control over the nature and quality of goods sold by Alcon.

286.    As a consequence, Novartis is an essential party to this claim and is liable equally with Alcon for the harms caused to Lens.com and consumers.

287.    As a direct and proximate result of Defendants' materially misleading and deceptive conduct, Lens.com suffered and will continue to suffer harm as a result of Defendants' false advertising, including, but not limited to, harm to Lens.com's name, reputation, sales, and goodwill.

288.    Lens.com seeks disgorgement of Defendants' profits, damages, attorneys' fees and costs, injunctive relief, and/or or any such other relief this Court deems appropriate.

### TENTH CAUSE OF ACTION
**(Alcon and Novartis)**
**Declaratory Judgment of Non-Infringement under the Lanham Act, 15 U.S.C. §§ 1114, 1125, New York General Business Law §§ 349, 350, and Common Law**

289.    Lens.com incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

290.    Alcon asserts trademark infringement against Lens.com based upon Lens.com's import and sale of Dailies Lenses, Optix Lenses, O2 Optix Lenses, and Air Optix Colors lenses in so-called older and international product packaging.

291.    Alcon asserts that Lens.com is infringing certain registrations under the Lanham Act, New York General Business Laws, and federal common law by importing and selling the above contact lenses in the so-called older product packaging. Some of the marks Lens.com is accused of infringing include: USPTO Reg. Nos. 1,055,870, 3,964,835, 4,560,685, and 5,412,293 (ALCON) (the "Alcon Marks"). Alcon also claims that Lens.com is infringing the Novartis Marks.

292.    No material differences exist between the so-called older and international product packaging and the new allegedly U.S. specific product packaging.

293.    The so-called older and international product packaging does not prevent or otherwise affect Defendants' ability to exercise quality control over these products.

294.    Notwithstanding Alcon's claims, other federal law clearly authorizes Lens.com's sale of Alcon products in older and international packaging.

295.    Specifically, the Fairness to Contact Lens Consumer Act, enacted after the Lanham Act, specifically authorizes a contact lens prescription to be filled under any label used by the company manufacturing the contact lens.

296.    These provisions were added to federal law because of the monopoly power held by contact lens manufacturers, including Alcon.

297.    Lens.com seeks judgment from this Court declaring that Lens.com has not infringed any of the Alcon Marks or the Novartis Marks, either directly, indirectly, contributorily, or in any other manner, in violation of the Lanham Act 15 U.S.C. §§ 1114 or 1125, New York General Business Laws §§ 349 or 350, or under the Common Law and such other relief as this Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Lens.com prays that the Court enter judgment on its behalf and order that:

A.      Alcon is not entitled to any relief on the claims raised in its Complaint and that the Complaint be dismissed with prejudice;

B.      Alcon has engaged in a contract, combination, and conspiracy in violation of Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1–3), Sections 14 and 15 of the Clayton Act, and the New York Donnelly Act, and Lens.com has been injured in its business and property as a result of Alcon's violations;

C.      Lens.com recover damages it has sustained, as provided by federal antitrust laws and the New York Donnelly Act and that a judgment in favor of Lens.com be entered against Alcon in an amount to be trebled to the extent permitted by such laws;

D.      Lens.com recover restitutionary relief to the extent such relief is afforded by any of the laws listed above;

E.      Alcon and its subsidiaries, affiliates, successors, transferees, assignees, and other respective officers, directors, partners, agents, and employees, as well as all other personas acting or claiming to act on Alcon's behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement described herein;

F.      Defendants and their subsidiaries, affiliates, successors, transferees, assignees, and other respective officers, directors, partners, agents, and employees, as well as all other personas acting or claiming to act on Defendants' behalf be permanently enjoined and restrained from engaging in false advertising, including placing U.S. Symbols and Statements and "CE" symbols on products which do not meet the criteria for having such marks and by placing the American flag on products;

G.      That Alcon and Novartis be disgorged of any and all profits derived from their false and misleading advertising;

H.      That Lens.com has not infringed the Alcon Marks or the Novartis Marks;

I.      Lens.com be awarded pre- and post-judgment interest at the highest legal rate;

J.      Lens.com recover its costs of this suit, including reasonable attorneys' fees as provided by law;

K.      Lens.com receive such other relief as the Court deems just, equitable and appropriate.

## RELIANCE ON JURY DEMAND

Lens.com, in accordance with Rule 38 of the Federal Rules of Civil Procedure, relies on the jury demand submitted by Alcon.

DATED: January 21, 2020.

 THORPE, NORTH & WESTERN, LLP

By: */s/ Jed Hansen*
Jed Hansen (*admitted pro hac vice*)
Mark Bettilyon (admitted *pro hac vice*)
Peter M. de Jonge (admitted *pro hac vice*)
Catherine M. Maness (admitted *pro hac vice*)
175 S. Main St., Suite 900
Salt Lake City, UT 84111
Telephone: (801) 566-6633
Facsimile: (801) 566-0750
Email:  hansen@tnw.com
        mark.bettilyon@tnw.com
        dejonge@tnw.com
        catherine.maness@tnw.com

CADWALADER, WICKERSHAM & TAFT, LLP
William J. Natbony (WJN 5507)
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: bill.natbony@cwt.com


 JONES WALDO HOLBROOK & MCDONOUGH
Nathan D. Thomas (admitted pro hac vice) 170 S. Main St., Suite 1500 Salt Lake City, UT 84101 Telephone: (801) 521-3200
Facsimile: (801) 328-0537
Email: nthomas@joneswaldo.com