**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALCON VISION, LLC, | Case No.: 1:18-cv-00407-NG-RLM |
| Plaintiff, | |
| v. | Judge Nina Gershon |
| LENS.COM, INC. | |
| Defendant. | |
| LENS.COM, INC., | |
| Counterclaim Plaintiff, | |
| v. | |
| ALCON VISION, LLC, and NOVARTIS AG, | |
| Counterclaim Defendants. | |

**DEFENDANT LENS.COM'S MEMORANDUM IN OPPOSITION TO MOTION TO**
**DISMISS FILED BY PLAINTIFF ALCON VISION, LLC.**

THORPE NORTH & WESTERN, LLP
Mark Bettilyon (admitted *pro hac vice*)
Peter M. de Jonge (admitted *pro hac vice*)
Catherine M. Maness (admitted *pro hac vice*)
175 S. Main St., Suite 900
Salt Lake City, UT 84111
Telephone: (801) 566-6633
Facsimile: (801) 566-0750
Email: mark.bettilyon@tnw.com
     dejonge@tnw.com
     catherine.maness@tnw.com

CADWALADER, WICKERSHAM & TAFT LLP
William J. Natbony (WJN 5507)
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: bill.natbony@cwt.com

JONES WALDO HOLBROOK &
MCDONOUGH
Nathan D. Thomas (admitted pro hac vice)
170 S. Main St., Suite 1500
Salt Lake City, UT 84101
Telephone: (801) 521-3200
Facsimile: (801) 328-0537
Email: nthomas@joneswaldo.com

# TABLE OF CONTENTS

Factual and Procedural Background ...................................................................................1

Legal Standard ...................................................................................................................3

Argument ............................................................................................................................4

I.    Lens.com raises a reasonable expectation that discovery will reveal evidence of an illegal agreement. ..................................................................................................................4

    A.    Lens.com has plausibly alleged a conspiracy. ..........................................................4

    B.    Lens.com has defined the relevant market.............................................................7

    C.    Lens.com has plausibly alleged monopoly power, exclusionary conduct, and specific intent. ..............................................................................................10

    D.    Lens.com has plausibly alleged exclusive dealing and an illegal tie. ......................12

    E.    Lens.com has plausibly alleged antitrust injury and standing. ...............................14

II.    The *Noerr-Pennington* doctrine does not immunize Alcon's anticompetitive conduct. ....18

III.    The Declaratory Judgment Counterclaims Serve a Useful Purpose ....................................19

IV.    Lens.com Has Plausibly Pled Alcon's Deceptive Conduct Using the American Flag ......20

V.    Lens.com Has Pled Alcon's Deceptive Conduct Using the Symbols and Statements ......20

VI.    Lens.com's Unclean Hands Defense Should Not Be Stricken ............................................22

VII.    Lens.com Has Reasonably Pled Its Failure to Join a Necessary Party Defense ................23

VIII.    Lens.com Has Adequately Pled the FDCA Preemption Defense ......................................23

IX.    Lens.com Has Adequately Pleaded the Copyright First-Sale Doctrine Defense ................24

X.    Lens.com Properly Alleged Its Abandonment Affirmative Defense ..................................24

CONCLUSION ..................................................................................................................25

## TABLE OF AUTHORITIES

## Cases

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)................................................................................................ 3, 4

*Bennett v. Spoor Behrins Campbell & Young, Inc.*,
 124 F.R.D. 562 (S.D.N.Y. 1989). ............................................................................ 23

*Bischoff v. Osceola Cty.*,
 222 F.3d 874 (11th Cir. 2000) .................................................................................. 15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977) .................................................................................................. 14

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
 843 F.3d 48 (2d Cir. 2016). ...................................................................................... 22

*Commercial Data Servs., Inc. v. IBM Corp.*,
 262 F. Supp. 2d 50 (S.D.N.Y. 2003)........................................................................ 13

*Costco Wholesale Corp. v. JJVC*,
 2015 WL 9987969 (M.D. Fla. Nov. 4, 2015) .................................................. 8, 17, 22

*Davidson v. Capital One Bank (USA), N.A.*,
 797 F.3d 1309 (11th Cir. 2015) .................................................................................. 3

*Dial Corp. v. News Corp.*,
 165 F. Supp. 3d 25 (S.D.N.Y. 2016)......................................................................... 13

*Eisai, Inc. v. Sanofi Aventis US, LLC*,
 821 F.3d 394 (3d Cir. 2016)...................................................................................... 12

*Emco, Inc. v. Obst*,
 2004 WL 1737355 (C.D. Cal. May 7, 2004) ............................................................ 20

*Estee Lauder, Inc. v. Fragrance Counter, Inc.*,
 189 F.R.D. 269 (S.D.N.Y. 1999). ............................................................................ 22

*Forschner Grp., Inc. v. Arrow Trading Co.*,
 30 F.3d 348 (2d Cir. 1994)........................................................................................ 20

*Gatt Communications, Inc. v. PMC Associates, LLC*,
 711 F.3d 68 (2d Cir. 2013)........................................................................................ 16

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*,
 425 U.S. 738 (1976).................................................................................................... 3

*In re Disposable Contact Lens Antitrust, Litig.*,
 215 F. Supp. 3d 1272 (M.D. Fla. 2016)............................................................. 3, 6, 9

*In re Elysium Health-Chromadex Litig.*,
 354 F. Supp. 3d 330 (S.D.N.Y. 2019)....................................................................... 19

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
 383 F.Supp.3d 187 (S.D.N.Y. 2019)................................................................... passim

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
 562 F.Supp.2d 392 (E.D.N.Y. 2008) ..................................................................... 9-10

*In re: Fluoroquinolone Prods. Liability Litig.*,
 122 F. Supp. 3d 1378 ............................................................................................. 8, 17

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
 924 F.3d 57 (2d Cir. 2019)................................................................................... 15-16

*Kaufman v. Time Warner*,
   836 F.3d 137 (2d Cir. 2016)...................................................................... 13-14

*Kirstsaeng v. John Wiley & Sons, Inc.*,
   568 U.S. 519 (2013) ................................................................................. 24

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959) ................................................................................. 17

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 17

*Lujan v. Nat'l Wildlife Fed.*,
   497 U.S. 871 (1990) ................................................................................. 4

*Maxon Hyandai Mazda v. Carfax, Inc.*,
   2014 WL 4988268 (S.D.N.Y. Sept. 29, 2014)....................................... 4

*Metro. Intercollegiate Basketball Ass'n v. NCAA*,
   337 F. Supp. 2d 563 (S.D.N.Y. 2004).................................................... 12

*Mitsubishi Heavy Indus., Ltd. v. Gen. Elec. Co.*,
   720 F. Supp. 2d 1061 (W.D. Ark. 2010)................................................ 18

*Muransky v. Godiva Chocolatier, Inc.*,
   922 F.3d 1175 (11th Cir. 2019) .............................................................. 15

*OEM Glass Network, Inc. v. Mygrant Glass Co.*,
   2020 WL 509281 (E.D.N.Y. Jan. 31, 2020) .......................................... 5-6

*Patsy's Italian Rest., Inc. v. Banas*,
   575 F. Supp. 2d 427 (E.D.N.Y. 2008). .................................................. 25

*Pearson Educ., Inc. v. Allen Air Conditioning Co.*,
   2013 WL 5870235 (S.D.N.Y. Oct. 22, 2013). ....................................... 24

*Perez v. De Domenico Pizza & Rest., Inc.*,
   2016 WL 3774389 (E.D.N.Y May 31, 2016). ....................................... 23

*Pernod Ricard USA LLC v. Bacardi U.S.A., Inc.*,
   702 F.Supp.2d 238 (D. Del. 2010).......................................................... 20

*POM Wonderful LLC v. Coca-Cola Co.*,
   134 S. Ct. 2228 (2014).............................................................................21-22

*Ross v. Am. Express Co.*,
   35 F. Supp. 3d 407 (S.D.N.Y. 2014)....................................................... 7

*Shak v. JPMorgan Chase & Co.*,
   156 F. Supp. 3d 462 (S.D.N.Y. 2016)..................................................... 11

*Starter Corp. v. Converse, Inc.*,
   84 F.3d 592 (2d Cir. 1996)...................................................................... 20

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001).....................................................................9-10

*Todorov v. DCH Healthcare Authority*,
   921 F.2d 1438 (11th Cir. 1991) .............................................................. 14

*Tops Markets, Inc. v. Quality Markets, Inc.*,
   142 F.3d 90 (2d Cir. 1998)...................................................................... 10

*United States v. Am. Express Co.*,
   838 F.3d 179 (2d Cir. 2016)................................................................ passim

*Windows User, Inc. v. Reed Bus. Pub. Ltd.*,
   795 F. Supp. 103 (S.D.N.Y. 1992). ........................................................ 21

iv

**Statutes**

15 U.S.C. § 1127..................................................................................................... 24
21 U.S.C. § 360j(n)................................................................................................ 23

**Other References**

McCarthy on Trademarks and Unfair Competition 5th § 27.65.50............................................. 21

## Factual and Procedural Background

***Alcon's Counterclaim Allegations***

Alcon has long viewed gray market sales as ███████████████ not because such sales jeopardize patient safety—they do not—but because they ████████████████████ ██████████████████████████ Lens.com Second Am. Countercl. ("SACC") ¶ 71. Eye-care practitioners ("ECPs") will not ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████

*Id.* ¶¶ 71–72, 127–131. This is the crux of Lens.com's antitrust counterclaims.

The conspiracy in which Alcon is involved includes at least four types of conduct:

(1)   ***UPPs.*** Non-discounting Retailers agree to prescribe and/or sell Alcon lenses and, in return, Alcon ████████████████████████████ ████████████████████████████, SACC ¶¶ 15(a), 69–93, 238(a), 248(b);[1]

(2)   ***Group boycotts.*** At the behest of ███████████████ ████████████████████████████████████ ██████████ SACC ¶¶ 15(b), 103–122, 158–162, 214–216, 230, 238(b), 248(a);

(3)   ***Exclusive-dealing and tying clauses.*** To ███████ the gray market, ████ ████████████████████████████████████████, Alcon mandates retailer agreements that contain anticompetitive exclusive-dealing and tying clauses, SACC ¶¶ 15(d)–(e), 94–102, 163–174, 212–213, 230, 238(c)–(d), 248(c)–(d); and

---

[1] A June 5, 2019 Transfer Order separated Lens.com's UPP Claims from its Non-UPP Claims. *See* Transfer Order Dkt. No. 256, Case No. 3:15-md-2626 (M.D. Fla. June 5, 2019). Lens.com's SACC therefore makes note of the partial MDL transfer while still pleading facts related to both the UPP and non-UPP aspects of Alcon's anticompetitive conduct. Alcon sought dismissal of Lens.com's UPP Claims. Judge Schlesinger of the Middle District of Florida denied Alcon's motion on February 19, 2020. Order Denying Alcon Motion to Dismiss Dkt. No. 1151 at 3, Case No. 3:15-md-2626 (M.D. Fla. Feb. 19, 2020). Thus, those UPP Claims will return to this Court for further proceedings.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

(4)    ***Pretextual packaging changes.*** ████████████████████

████████████████████████████████████, Alcon implements pretextual

packaging changes and brings baseless trademark litigation to punish Lens.com for its

discounting practices, SACC ¶¶ 15(c), 132–157, 217–219, 231, 238(e), 249.

Lens.com's SACC also describes how Alcon's pretextual packaging changes led Alcon to make

false and misleading statements about its lenses, including its use of various "U.S. Symbols and

Statements" and its use of the American flag. *See* SACC ¶¶ 175–208, 257–288.

### *Case Status and Recent Rulings*

**Alcon's MDL Motion to Dismiss.** In June 2019, two of Lens.com's counterclaims—the

two directly related to Alcon's UPPs—were transferred to the contact lens antitrust MDL hosted

in the Middle District of Florida. Shortly thereafter, Alcon filed a motion to dismiss in the MDL,

making many of the same arguments, including that Lens.com fails to plausibly allege antitrust

injury (and thus cannot establish antitrust standing) and that Lens.com fails to define a relevant

market (and thus cannot show anticompetitive effect). *See generally* Alcon MDL Mot. to

Dismiss ("MDL MTD"), Dkt. No. 1029, Case No. 3:15-md-2626 (M.D. Fla. Sept. 3, 2019).

On February 19, 2020, Judge Schlesinger, who presides over the Florida MDL, denied that

motion. As to the "relevant market"/"anticompetitive effect" argument, the Florida MDL court

wrote that "the Court need not discuss whether a UPP claimant plausibly alleged anticompetitive

effect against Alcon," as the Florida MDL Court "has addressed Alcon's arguments on this point

multiple times and will not repeat that analysis." Order Denying Alcon MDL MTD, Dkt. No.

1151 at 3, Case No. 3:15-md-2626 (M.D. Fla. Feb. 19, 2020). As to antitrust injury and standing,

Judge Schlesinger held that "Lens.com has adequately identified how Alcon's actions injured it,

citing lost sales, compromised goodwill, and interruptions to the supply chain," and concluded

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

that because Lens.com "plausibly asserts that the UPPs' effect was to marginalize or eliminate discount retailers," Lens.com "has sufficiently alleged injury." *Id.* at 4–5.

**Alcon's PI Motion.** In April 2019, more than fourteen months after filing its Complaint, Alcon reserved a motion for preliminary injunction (its "PI Motion"). *See* Dkt. No. 55. In a thorough, 57-page Report and Recommendation dated February 28, 2020, Magistrate Judge Mann recommended that Alcon's PI Motion be denied. Based on years of interactions between Alcon and Lens.com, Judge Mann concluded that Alcon has failed to establish that its packaging changes or its quality-control measures were non-pretextual. Dkt. No. 201 at 45, 49. Judge Mann noted that Alcon had done nothing to rebut expert findings that "there was no statistically significant difference between the authorized lenses and those sold by Lens.com." *Id.* at 53. Judge Mann closed by finding that the injunction Alcon had requested "would impede competition in the marketplace and negatively affect prices for consumers." *Id.* at 55.

## Legal Standard

"[I]n antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976). Lens.com's burden is simply to plead enough facts in its SACC "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). In applying this standard, the Court must accept Lens.com's allegations as true, consider those allegations in the light most favorable to Lens.com, and "accept all reasonable inferences that can be drawn from such allegations." *In re: Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1279 (M.D. Fla. 2016); *see also Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1312 (11th Cir. 2015). The Court must also thus "presume[] that

general allegations [contained in the pleading] embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990).

**Argument**

**I.     Lens.com raises a reasonable expectation that discovery will reveal evidence of an illegal agreement.**

Alcon devotes most of its Motion to arguing that Lens.com has not "plausibly allege[d] the basic elements of [a] conspiracy." Alcon MTD, at 5. In doing so, Alcon flips back and forth between two themes. The first is that Lens.com has not pleaded facts sufficient to support its claims. *Id.* The second is that the Alcon conduct described in Lens.com's SACC is "entirely consistent with a manufacturer's unilateral decisions to protect its brand, ensure supply chain integrity, and protect customers." *Id.* Neither argument warrants dismissal.

It is widely recognized that often, at first glance, "competitive and exclusionary conduct look alike." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F.Supp.3d 187, 238–39 (S.D.N.Y. 2019). As a result, "[t]he metes and bounds of when such behavior impermissibly crosses the line from competitive to violative of the Sherman Act is a highly contextual analysis," and thus "any procompetitive justification for such restrictions *is not appropriately weighed on a motion to dismiss*." *Id.* at 239 (emphasis added); *see also, e.g.*, *Maxon Hyundai Mazda v. Carfax, Inc.*, 2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014). Lens.com, as described in detail below, makes clear that it has pleaded facts sufficient to lead to the conclusion that discovery will plausibly reveal evidence of an illegal conspiracy.  *See Twombly*, 550 U.S. at 545.

**A.     Lens.com has plausibly alleged a conspiracy.**

Alcon first argues that Lens.com has not plausibly alleged a *per se* unlawful "horizontal agreement among manufacturers," Alcon MTD, at 5, has not plausibly alleged "joint or

4

concerted action" related to its packaging changes, *id.* at 6–9, and has not plausibly alleged a group boycott, *id.* at 9–10. All three arguments are plainly incorrect.

      **1.**      **Group boycotts—like the one alleged here—are horizontal agreements and constitute *per se* antitrust violations.**

Alcon acknowledges that horizontal agreements among competitors to reduce competition are the "most prominent[]" type of *per se* antitrust violation. *Id.* at 5. Alcon insists, however, that "[t]he only horizontal agreement to which Lens.com even alludes relates to UPPs, which are not at issue here." *Id.* That is flatly wrong. "[C]ertain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations . . . ." *OEM Glass Network, Inc. v. Mygrant Glass Co.*, 2020 WL 509281, at *7 (E.D.N.Y. Jan. 31, 2020). Reduced to its simplest terms, "[a] concerted refusal to deal or group boycott is 'an agreement to pressure a supplier or customer not to deal with another competitor." *Id.*

That is exactly what Lens.com has alleged. When non-discounting Retailers



_____

2 Alcon argues that even though it sent an email █████████████████████████████████████ or that Alcon and its distributors ever reached an agreement. Alcon MTD, at 9–10. Lens.com plainly alleges that ████████████████████████████████████████ Alcon is thus asking the Court to disbelieve the allegations in Lens.com's SACC, which the Rule 12 standard does not permit the Court to do at this stage.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

Lens.com's SACC describes the group boycott in sharp detail, ████████████

████████████████████████████████████████████████████████████████

████████████████ *See id.* ¶¶ 103–122, 158–162. As a recent analogous case observed, if the

"allegations here are insufficient to allege an agreement" to restrain trade, it is not clear "what

kind of allegations could, as a practical matter, allege such an agreement." *OEM Glass*, 2020 WL

509281, at *10.[3]

### 2. Alcon's packaging strategy constitutes "concerted action" with non-discounting Retailers and distributors to "combat price discounting."

Given that "unlawful conspiracies tend to form in secret," proof of antitrust conspiracies

"will rarely consist of explicit agreements." *In re Keurig*, 383 F. Supp. 3d at 242. Instead,

conspiracies are more often "proven through inferences that may fairly be drawn from the

behavior of the alleged conspirators." *Id.*

Alcon argues that Lens.com has not either alleged an explicit agreement related to its

"packaging strategy" or alleged "facts from which an agreement can be inferred." Alcon MTD,

at 6–8. Just as it did in the MDL, Alcon misrepresents what type of "agreement evidence" the

law requires. As the MDL Court explained, both in ruling on Alcon's summary-judgment motion

and on its first motion to dismiss, antitrust claimants "are not required to proffer explicit

agreement evidence," but rather must plead (and, at summary-judgment stage, present evidence

of) "a unity of purpose," *or* "a common design and understanding," *or* "a meeting of minds in an"

---

[3] Alcon argues that these agreements are not horizontal because Alcon is not "in a horizontal relationship with its distributors." Alcon MTD, at 6 n.2. As an initial matter, that is incorrect. As Lens.com's SACC makes clear, Alcon acts as a distributor of its own lenses, and has frequently sought to sell its lenses directly to Lens.com. *See, e.g.*, SACC ¶¶ 94–102, 163–167. When Alcon decides not to sell its lenses to a retailer and demands an agreement from all other distributors that they do the same, that constitutes a horizontal agreement. In any event, even if Alcon *did not* operate on the distributor level, it would make no difference. By instituting a group boycott among horizontally-situated distributors, Alcon participated in a hub-and-spoke conspiracy—a conspiracy made up of both vertical and horizontal agreements—and when the objective of such a conspiracy is a "*per se* unreasonable restraining of trade," *all* participants in that conspiracy are liable. *OEM Glass*, 2020 WL 509281, at *7.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

unlawful arrangement." *In re Disposable Contact Lens Antitrust Litig.*, 2019 WL 6463343, at *4 (M.D. Fla. Nov. 27, 2019) (emphasis added). In other words, "[n]o formal agreement is required to constitute an antitrust conspiracy"—rather, the conspiracy "may be found in a course of dealings or other circumstances as well as in any exchange of words," and "[i]t is enough that 'concert of action is contemplated and . . . the [co-conspirators] conformed to the arrangement." *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 431 (S.D.N.Y. 2014).

Lens.com alleges that Alcon's packaging strategy depended on both Manufacturer–Retailer Agreements and Manufacturer–Distributor Agreements. *See* SACC ¶¶ 42–43. Under those agreements, conspiring retailers agreed "to prescribe and/or sell Alcon lenses in return for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Distributors agreed ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* In return, Alcon agreed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* Lens.com alleges specifically that Alcon's packaging changes and its group boycott were developed ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See id.* ¶¶ 142–150, 158–162, 166–169, 211–219. Lens.com also specifically alleges a number of ways in which ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮. *See, e.g., id.* ¶¶ 3, 15, 58, 102, 113–117, 127–131, 135–138, 142–147, 155, 158, 210–220, 230–233, 238, 248. Lens.com has thus plausibly pleaded concerted action.

**B.  Lens.com has defined the relevant market.**

**1.  The MDL Court has rejected this argument at least three times.**

Alcon next argues that Lens.com has not plausibly alleged a relevant product market.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

Alcon MTD, at 10. Alcon takes issue, in particular, with the idea that, given the unique nature of the market for contact lenses, "each lens type produced by each [m]anufacturer can constitute a discrete product market for antitrust purposes." *Id.* at 11. That idea does not apply here, Alcon argues, because it is based on a holding by "a court outside of this district." *Id.*

That is a remarkable way to refer to a holding made by Judge Schlesinger in the very MDL in which two of the Lens.com antitrust claims currently reside. What's more, it is a holding that Judge Schlesinger has now been forced to make *three times*. In briefing submitted by Costco and Johnson & Johnson (JJVC), JJVC made the exact argument that Alcon makes here: that a single brand of contact lenses cannot constitute a relevant market for antitrust purposes. The Florida MDL Court expressly rejected that argument, holding that "[a] single branded product may, in rare cases, constitute its own relevant market . . . ," *Costco Wholesale Corp. v. JJVC*, 2015 WL 9987969, at *13 (M.D. Fla. Nov. 4, 2015).[4] There is no reason to reach an inconsistent result in this case.[5]

Alcon argues that the relevant-market holding in the Costco–JJVC dispute "is inapposite." Alcon MTD, at 11. But Alcon itself raised a nearly identical argument in moving to dismiss Class Plaintiffs' claims in the MDL, and the Florida MDL Court rejected it. In doing so, the Court emphasized that in "hub-and-spoke" conspiracies, a defendant is not permitted to "deconstruct the larger alleged conspiracy" into component parts in order to escape conclusions regarding the conspiracy's anticompetitive effect, as "[t]he character and effect of a conspiracy

---

[4] The Florida MDL Court found several Costco allegations particularly relevant: the allegation that the anticompetitive conduct at issue resulted in "higher [lens] prices," allegations regarding "the resultant motivations for prescribing a certain product," and allegations regarding the effect of the conspiracy on "market and competition." *See id.* All of those same allegations are present here. *See* SACC ¶¶ 53, 66, 75, 93, 202, 221, 233, 242 (Alcon's desire to increase prices and market share); *id.* ¶¶ 46–54 (motivations for prescribing certain lenses); *id.* ¶ 64, 122, 221–222, 233–234 (decrease in competition at both the retail and distributor level).

[5] This is particularly true because one express purpose of "centraliz[ing]" proceedings via an MDL is to "establish[] . . . a uniform pretrial approach" for similar cases and to "reduce the potential for inconsistent pretrial rulings." *In re: Fluoroquinolone Prods. Liability Litig.*, 122 F. Supp. 3d 1378, 1380 (J.P.M.L. 2015).

are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.*

Most relevant of all, the Florida MDL Court has already addressed this question in this very case, based on the same set of facts and arguments. After Lens.com's UPP claims were transferred to the MDL, Alcon's counsel moved to dismiss on this exact theory—that "Lens.com's alleged market for *specific types* of *specific brands* of contact lenses is untenable." Alcon MDL MTD, at 23. Having ruled more than once on that same issue already, Judge Schlesinger made clear that his answer had not changed. With respect to the "relevant market"/"anticompetitive effect" argument made in Alcon's MDL MTD and made again here, he wrote, "[T]he Court need not discuss whether a UPP claimant plausibly alleged anticompetitive effect against Alcon; the Court has addressed Alcon's arguments on this point multiple times and will not repeat that analysis now." Order Denying Alcon MDL MTD, at 3.

### 2. Alcon has properly alleged the relevant product market.

One of the reasons Alcon's relevant-market argument has failed over and over again is because the argument is poorly suited for a motion to dismiss. "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (collecting cases). In order to survive a motion to dismiss, then, the relevant product market alleged must simply be "plausible" and "bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand.'" *Id.* at 200. Put differently, "[t]he contours of the relevant market track the cross-elasticity of demand: the extent to which products or services are perceived by consumers to be reasonably interchangeable for the same purposes." *In re Payment Card*

*Interchange Fee & Merchant Discount Antitrust Litig.*, 562 F.Supp.2d 392, 399 (E.D.N.Y. 2008). The question is whether a consumer can "respond to an increase in [price for] one [product] by purchasing the other," and if products are fungible in that way, those two products are more likely to be considered part of the same product market. *Id.*

The market for contact lenses is dramatically different from the markets for pizza or theater tickets or watches. *See Todd*, 275 F.3d at 200 n.3; SACC ¶ 227. Once an ECP selects a brand and type of contact lens for a patient, that patient cannot respond to an increase in price for that lens by simply switching to another brandr; the patient is locked in by the prescription. These mechanics of the contact-lens industry are described in Lens.com's SACC, *see id.* ¶¶ 46–58, as are the two relevant product markets: the market for "each brand and type of contact lens," and (more broadly) "the market for disposable contact lenses," *see id.* ¶¶ 36–41, 226–229. Alcon is free to argue about the propriety of that market definition following fact discovery, but given the specificity of Lens.com's pleadings regarding the relevant product market, Alcon cannot prevail on a motion to dismiss. "The proper market definition . . . can be determined only after a factual inquiry into the commercial realities faced by consumers." *See United States v. Am. Express Co.*, 838 F.3d 179, 196–97 (2d Cir. 2016) (cleaned up).

**C.    Lens.com has plausibly alleged monopoly power, exclusionary conduct, and specific intent.**

With respect to Lens.com's fifth and sixth causes of action, Alcon argues that Lens.com has not plausibly alleged that Alcon wields monopoly power, *see* Alcon MTD, at 12, that it has participated in any exclusionary conduct, *see id.* at 13, or that it has acted with the intent to monopolize, *see id.* at 13–14. Alcon is mistaken.

**1.    Lens.com has alleged market-share dominance, price control, and exclusionary conduct.**

An antitrust plaintiff may show monopoly power either by (1) proving "directly by

evidence of the control of prices or the exclusion of competition" or (2) relying on the inference of power arising from "one firm's large percentage share of the relevant market." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 481 (S.D.N.Y. 2016). Alcon's arguments regarding monopoly power and exclusionary conduct thus overlap.

Lens.com has alleged that Alcon "possesses monopoly power over each Individual Lens Market for Alcon lenses in the United States." SACC ¶¶ 246–250. That conclusion is inescapable, as *only Alcon manufacturers Alcon lenses. See* First Am. Compl. ¶ 9; Alcon First MTD, at 13–14 (acknowledging that Alcon "necessarily" has a monopoly over the "initial distribution" of its lenses. As to the broader "market for disposable contact lenses," Lens.com has alleged that that market too is "highly coordinated and. . . concentrated at the manufacturer, distributor, and retailer levels." SACC ¶ 41; *see also id.* ¶¶ 9–14 & n.2, 49, 229.

Lens.com has also plausibly alleged monopoly power through its allegations regarding price control and exclusionary conduct. Nearly the entire body of conduct alleged in the SACC relates to Alcon and its ability to set and control prices within the market, *see, e.g., id.* ¶¶ 3–7, 15, 42–45, 50–58, 69–93, 102–112, 128–147, 211, 221, 233–234, 240–243, 247–250, 254. Similarly, Lens.com has plainly alleged that Alcon has engaged in exclusionary conduct specifically within the context of its Fifth and Sixth Claims. *See id.* ¶¶ 239–240, 252. This theory is, in fact, evident from the very first line of the very first paragraph of the SACC ("Lens.com's Counterclaim centers on Alcon's attempts to exclude Lens.com from the contact-lens market because of the threat Lens.com poses to Alcon (and to Alcon's preferred retailers) as a discount seller of contact lenses,") *see id.* ¶ 1, and in entire sections of the SACC devoted to the group boycott instituted by Alcon, *see id.* ¶¶ 102–119, 158–162.

### 2.    Lens.com has alleged specific intent to monopolize.

Alcon argues that Lens.com's allegation that Alcon has acted with a specific intent to monopolize is "at odds" with Lens.com's "basic theory" that Alcon intends to "reduce price competition for its distributors and non-discounting Retailers." Alcon MTD, at 14. There is nothing inconsistent about those two statements. The threat to Alcon's market control comes from discounting Retailers like Lens.com. *See* SACC ¶ 1. With a significant share of the retail market and distribution market entirely under Alcon's control, the only impediment to price-fixing or other anticompetitive conduct are non-conspiring distributors (which Alcon attempts to identify and eliminate) and discounting Retailers. By tightening its monopolistic hold on those markets, Alcon simultaneously reduces price competition for its co-conspirators. *See, e.g.*, SACC ¶¶ 4–7, 64, 71–77, 239, 242.

The question of a monopolist's specific intent is uniquely fact-specific. *See, e.g.*, *Metro. Intercollegiate Basketball Ass'n v. NCAA*, 337 F. Supp. 2d 563, 573 (S.D.N.Y. 2004). As Lens.com argued above, Alcon is free to attempt to prove, at the summary-judgment stage, that its conduct was competitive and not exclusionary. *In re Keurig*, 383 F. Supp. 3d at 238–39. But Alcon's alternative explanations for its conduct—its "procompetitive justifications" are "not appropriately weighed on a motion to dismiss," *id.* at 239, and all such arguments fail.

### D.    Lens.com has plausibly alleged exclusive dealing and an illegal tie.

### 1.    Lens.com's SACC links exclusive-dealing agreements to the foreclosure of competition and to competitive harm.

"[A]n exclusive dealing arrangement . . . is an express or *de facto* 'agreement in which a buyer agrees to purchase certain goods . . . only from a particular seller for a certain period of time.'" *Eisai, Inc. v. Sanofi Aventis US, LLC*, 821 F.3d 394, 403 (3d Cir. 2016). As Lens.com states in its Counterclaim, Alcon has long pressured Lens.com to enter into an illegal exclusive-

dealing agreement ███████████████████████████ for Alcon lenses and,

when Lens.com refused to do participate, Alcon ████████████████████

█████████████████████ *See* SACC ¶¶ 15(d), 94–102, 163–174, 212–213, 230. 238(c),

248(c).

An agreement that prohibits a market participant from "develop[ing] alternative

distributors" is an exclusive-dealing arrangement, *see Commercial Data Servs., Inc. v. IBM

Corp.*, 262 F. Supp. 2d 50, 76 (S.D.N.Y. 2003), and that is precisely what the Alcon agreements

described in Lens.com's SACC do. The exclusive-dealing agreements Alcon has pressured its

distributors and retailers into signing are designed to do one thing: eliminate price pressures

arising from the entry of "grey market" lenses into the U.S. market. As Lens.com alleges, "[t]he

probable effect of Alcon's exclusionary conduct is to substantially lessen competition in these

markets by excluding all market participants aside from itself and its authorized distributors,

foreclosing a substantial share of each Individual Lens Market for Alcon lenses in the United

States." *Id.* ¶ 252. And, as alleged in the SACC, the exclusive-dealing agreements harm

competition, both by excluding firms at the distribution level and by raising prices at the retail

level.[6] *See* SACC ¶¶ 15(d), 94–102, 163–174, 212–213, 230. 238(c), 248(c).

### 2.   Lens.com has plausibly alleged an illegal tie.

In a tying arrangement, a party refuses to sell a product to an interested buyer unless the

buyer also agrees to purchase "a different (or tied) product" from the seller. *Kaufman v. Time

Warner*, 836 F.3d 137, 141 (2d Cir. 2016). Alcon argues that Lens.com alleges something

different—that Alcon permits a buyer to buy a product only "on the condition that it not buy

---

[6] Alcon suggests that an exclusive-dealing agreement can be unlawful only if it harms *consumers*. That's incorrect. To demonstrate unlawful exclusive dealing, a claimant "need[s] to show that the probable effect of [the alleged] conduct is to harm *the competitive process*." *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 36 (S.D.N.Y. 2016). Of course, Alcon's agreements here do both.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

other Alcon products from unauthorized sources." Alcon MTD, at 15.

Lens.com's pleading on this point is clear.  It alleges, in part: in a January 29, 2018 email, "Alcon provided Lens.com with details on 'pricing' and 'terms,' including [the] express requirement[] that '100% of all [Lens.com] purchases [would be] direct from Alcon." SACC ¶ 166 (last two alterations in original). The "tie" Lens.com describes in its pleading is remarkable ███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ *See id.* ¶¶ 158–166.

This is a classic tying arrangement. "The fear of tie-ins is that a monopolist in one product market will seek to expand its monopoly by conditioning the purchase of the monopolized product upon the purchase of a product in a separate market." *Kaufman*, 836 F.3d at 141. A number of firms compete (at least in theory) to sell genuine Alcon lenses to retailers like Lens.com, including Alcon itself, preferred Alcon distributors, and (critically) non-preferred Alcon distributors. Rather than creating new packaging for all lenses and utilizing that packaging pretext as a basis on which to force Lens.com to purchase from Alcon direct, Alcon has sought to effect a tie between a few "newly" packaged lenses and its other lenses. *See* SACC ¶¶ 167–174.

### E.  Lens.com has plausibly alleged antitrust injury and standing.

Antitrust standing is simply "a search for the proper plaintiff to enforce the antitrust laws." *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1448 (11th Cir. 1991). To *prevail* on its claims, Lens.com will be obligated to "prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

In pressing the Court to accept its antitrust-injury argument, Alcon again invites the Court

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

to consider whether its conduct is actually "procompetitive" and faults Alcon for not providing "data point[s]" to supplement its allegation that it has lost sales. Alcon MTD, at 17. This is not the proper stage to require Lens.com to produce its evidence. "[P]rocompetitive justifications" for the alleged conduct cannot be "weighed on a motion to dismiss." *In re Keurig*, 383 F. Supp. 3d at 239. And Alcon's demand for "data points" is simply an attempt to force Lens.com to "demonstrate the merits of [its] case in order to establish [its] standing to sue." *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1184 (11th Cir. 2019). That is the wrong standard at this stage: Lens.com's burden for establishing standing "corresponds to 'the manner and degree of evidence required at the successive stages of litigation.'" *Id.* (quoting *Bischoff v. Osceola Cty.*, 222 F.3d 874, 878 (11th Cir. 2000)).

Nevertheless, *IQ Dental Supply*, a May 2019 Second Circuit decision, endorses Lens.com's damages theory. The defendants in *IQ Dental Supply* were dental-supply distributors who "purchase[d] dental supplies and equipment from different manufacturers, and then [sold] the products to dental practices nationwide," and the defendants "occup[ied] approximately 80% of the dental-supply distribution market." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 60–61 (2d Cir. 2019). Plaintiff IQ was also a dental-supply distributor, but rather than "deploying on-the-ground sales teams," IQ "distributed dental supplies through an online portal." *Id.* at 61. Defendants, recognizing the threat posed by a competitor who harnessing the cost savings and convenience associated with online sales, began to put "pressure" on IQ, with the intent to "disrupt [the] online sales portals" and "to affect IQ's business." *Id.*

IQ brought antitrust claims against the defendants, arguing both that they "engaged in a price-fixing conspiracy" and that defendants "organize[d] a boycott" of IQ's online portal and "pressur[ed] [dental-supply] manufacturers to stop supplying IQ." *Id.* Defendants cited

*Matsushita* arguing that because their alleged conduct had driven other IQ competitors from the market, IQ's very *presence* in the online-sales market was a result of Defendants' alleged conduct. *Id.* at 63. In short, the defendants argued—just as Alcon argues here—that IQ was a *beneficiary* of the alleged anticompetitive conduct and had thus suffered no injury. *Id.*

Though a district court initially agreed with defendant's argument, the Second Circuit reversed under the three-step antitrust-injury analysis established by *Gatt Communications, Inc. v. PMC Associates, LLC*, 711 F.3d 68, 76 (2d Cir. 2013). "At the first step of the *Gatt* analysis," the court explained, a plaintiff need only clear the "low bar" of plausibly alleging that defendants "have engaged in unlawful anticompetitive conduct." *IQ Dental*, 924 F.3d at 63. The boycott alleged by IQ "easily satisf[ied]" that requirement. *Id. Gatt*'s second step is to "isolate and identify" the "ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's conduct." *Id.* (quoting *Gatt*, 711 F.3d at 76).

The *IQ Dental* court concluded that, based on IQ's allegations, the conduct described was "not producing an ongoing competitive advantage for IQ." *Id.* at 64. Even if the distributor defendants' conduct helped IQ enter the market, IQ had properly alleged that "after it entered the market, its sales through [its online portal] suffered as a result" of defendants' anticompetitive conduct.  The court explained that IQ was "entitled to conduct its business in a market that is not infected with an anticompetitive distortion" and that the harm alleged was "they type of injury the antitrust laws were designed to prevent." *Id.* As to *Gatt*'s third step, the court concluded that there was "no substantial dispute that IQ ha[d] alleged that the Defendants' anticompetitive behavior caused their injury." *Id.*

The facts and arguments in this case track those in *IQ Dental.* In an attempt to reduce price competition for Alcon lenses, Alcon has targeted discounters like Lens.com, demanding that they

████████████████████████████████ *See* SACC ¶¶ 94–102, 158–174.

Lens.com has also isolated and identified how Alcon's conduct has injured Lens.com. Alcon's

injury stems not only from supra-competitive prices (as Alcon assumes) but also from sales lost

due to boycotts[7] and supply-chain interruptions, as well as from the delegitimization of

Lens.com's business (and harm to its goodwill with customers) caused by a sales boycott and a

campaign of disinformation by Alcon that lenses purchased from conspiring retailers were safe

while "lenses purchased from Lens.com and other online distributors were unsafe." *Id.* ¶¶ 118–

122, 222, 234, 243, 255. Lens.com has cleared the bar for pleading antitrust standing by pleading

far more than the "general factual allegations of injury" that are required at this stage, where

Lens.com's allegations are "presume[d]" to "embrace those specific facts that are necessary to

support [Lens.com's] claim." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992).[8]

    Judge Schlesinger has already resolved this "antitrust standing" question in Lens.com's

favor. In the February 2019 Order denying Alcon's Motion to Dismiss Lens.com's UPP Claims,

---

[7] Courts have long recognized the inherent anticompetitive effects of group boycotts. As one case explained:

    Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. [Citations.] . . . '[S]uch agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.' [Citation.] . . . . [The boycott as issue] takes from [plaintiff] its freedom to buy [goods] in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to [plaintiff] at the same prices and conditions made available to [another market participant] and in some instances forbids them from selling to it on any terms whatsoever. . . . It clearly has, by its 'nature' and 'character,' a 'monopolistic tendency.'

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–13 (1959).

[8] The standing argument Alcon makes here is also analytically indistinguishable from the standing argument JJVC made in this same MDL with respect to Costco. JJVC argued, just as Alcon does now, that Costco actually *benefitted* from the price-raising effects of the UPPs, because it could either increase its own prices or increase sales, because with the UPPs in place, "other retailers [were] charging higher prices for the lenses than Costco." *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, 2015 WL 9987969, at *8 (M.D. Fla. Nov. 4, 2015). The Court sided with Costco, concluding that "[a]t the pleading stage, Costco's general factual allegations of direct injury resulting from JJVC's Price Policy are sufficient to establish its standing." *Id.* Given the priority placed on consistency within MDL proceedings, there is no reason to depart from that well-reasoned analysis here. *See, e.g.*, *In re: Fluoroquinolone Prods. Liability Litig.*, 122 F. Supp. 3d at 1380.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

the Court found that "Lens.com has adequately identified how Alcon's actions injured it, citing lost sales, compromised goodwill, and interruptions to the supply chain." Order Denying Alcon MDL MTD, at 4–5. Based on those findings, the Court concluded that Lens.com "plausibly asserts" that the effect of Alcon's conduct was "to marginalize or eliminate discount retailers" and that Lens.com has thus "sufficiently alleged injury." *Id.* at 4–5. There is no reason for the Court to rule differently here.

## II.  The *Noerr-Pennington* doctrine does not immunize Alcon's anticompetitive conduct.

Alcon asks the Court to rule, in the context of a Motion to Dismiss, that its scheme to make slight packing changes then file a trademark suit against Lens.com for selling Alcon lenses in old packaging, "is immune from antitrust liability under the *Noerr-Pennington* doctrine." Alcon MTD, at 18–20. Alcon argues, specifically, that Lens.com should have made anticipatory allegations related to the *Noerr-Pennington* doctrine in its SACC and that if Alcon's suit is truly "objectively baseless," Lens.com would have moved to dismiss. *Id.* [9]

Even if Alcon believes that fact discovery will provide support for its *Noerr-Pennington* argument, Alcon has no claim to *Noerr-Pennington* immunity at this stage, where the allegations of Lens.com's pleadings are accepted as true. *See In re Keurig*, 2019 WL 1789789, at *20; *see also In re Restasis*, 333 F. Supp. at 155 (describing the "heavy burden placed on [a party] seeking *Noerr-Pennington* immunity" at the motion-to-dismiss stage). [10]

The "sham exception" to the *Noerr-Pennington* doctrine applies when a party files a

---

[9] Lens.com's decision not to file a motion to dismiss is not relevant to this inquiry. *See In re Keurig*, 2019 WL 1789789, at *20; *see also, e.g.*, *Mitsubishi Heavy Indus., Ltd. v. Gen. Elec. Co.*, 720 F. Supp. 2d 1061, 1067 (W.D. Ark. 2010) ("A complaint can meet all the pleading requirements of the Federal Rules of Civil Procedure and still, as a factual matter, be frivolous.").

[10] Even if Alcon's actual *filing* of this lawsuit were entitled to antitrust immunity—which it is not—the events *surrounding* the lawsuit, including Alcon's product-packaging changes, its attempts to coerce Lens.com into entering into an exclusive-dealing agreement, and its initiation of a group boycott, would not be entitled to such immunity.

lawsuit that in "'not genuinely aimed at procuring favorable government action' at all," but rather at achieving some other outcome. *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 339 (S.D.N.Y. 2019). Embedded in that principle is the critical question here: What was Alcon's *aim* in filing its lawsuit? Given the fact-dependent nature of that question, it should be resolved based on the evidence produced in the case (which would include, for example, internal Alcon communications and testimony given by Alcon witnesses). As a result, the sham exception to the *Noerr-Pennington* doctrine can be ruled on at the motion-to-dismiss stage only where "there is no dispute over the predicate facts underlying the legal proceeding." *In re Elysium Health*, 354 F. Supp. 3d at 336. Otherwise, the general rule applies: "the applicability of the sham exception [is] a question of fact for the jury." *Id.*[11]

To the extent the Court *does* set out to determine Alcon's true aim at this stage, Judge Mann's R&R provides guidance.  *See* Dkt. No. 201 As Judge Mann recognized, the Alcon lenses sold by Lens.com are no different from the lenses sold by other retailers, and the safety concerns Alcon raises are wholly pretextual. R&R at 40-43, 45-49. Simply put, given additional documents and declarations to review, Judge Mann came to view Alcon's conduct as pretextual. The Court should not deprive Lens.com of the opportunity to provide further evidence of the objective baselessness of this litigation. Alcon's *Noerr-Pennington* arguments should thus be rejected.

## III.   The Declaratory Judgment Counterclaims Serve a Useful Purpose

"A district court is required to entertain a declaratory judgment action . . . when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue . . . ."

---

[11] Judge Mann recognized the fact-dependent nature of a related question in her R&R, concluding that "whether a quality control measure is pretextual is a fact question, and thus requires an examination of the particular circumstances of each case." R&R, at 47.

*Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 597 (2d Cir. 1996). In its Motion, Alcon concludes, without any analysis, that Lens.com's non-infringement declaratory judgment counterclaim will not serve a useful purpose. *See* Alcon MTD, at 20. To the contrary, a declaratory judgment that Lens.com has not infringed Alcon's trademarks will offer Lens.com relief from future lawsuits.

## IV.   Lens.com Has Plausibly Pled Alcon's Deceptive Conduct Using the American Flag

According to Alcon, use of the American flag on product packaging cannot deceive consumers into believing that a product is "made in the U.S.A." as a matter of law. Alcon MTD, at 21-22.  The two cases Alcon cited in support of this argument are distinguishable as each case involves deceptive conduct using word marks, SWISS ARMY KNIFE and HAVANA CLUB.  In contrast, it is Alcon's placement of the U.S. flag on products that are not manufactured in the U.S. is the focus here.  *See Forschner Grp., Inc. v. Arrow Trading Co.*, 30 F.3d 348 (2d Cir. 1994); *Pernod Ricard USA LLC v. Bacardi U.S.A., Inc.*, 702 F. Supp. 2d 238, 247 (D. Del. 2010).  Courts have found that the U.S. flag, along with other symbols, can constitute a "false statement of fact about the geographic origin" of a product. *Emco, Inc. v. Obst*, 2004 WL 1737355, at *5 (C.D. Cal. May 7, 2004).  Alcon's latest additions to this argument, i.e. that an "express statement of origin makes it clear that the flag cannot even imply origin", is both nonsensical and does not change the ultimate result.  Alcon MTD at 22.  It remains a question of fact as to whether the American flag symbol leads U.S. consumers to believe Alcon products are manufactured in the U.S.

## V.   Lens.com Has Pled Alcon's Deceptive Conduct Using the Symbols and Statements

In its brief, Alcon first attempts to overly narrow what constitutes use of a trademark "in

commerce."[12] Alcon MTD at 22.  In particular, Alcon states that Lens.com's claim "should be dismissed" because Lens.com only alleges that "Alcon's wrongful act was selling products *outside the U.S.* while being 'well aware that Lens.com and numerous other suppliers in the United states have imported contact lenses from abroad . . . .'" which Alcon argues it "not sufficient to state a Lanham Act claim." *Id.* at 22-23.

The law on this issue, however, is clear: use in commerce is broadly construed; is determined on a case-by-case basis; and is generally described as a "bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127; *Windows User, Inc. v. Reed Bus. Pub. Ltd.*, 795 F. Supp. 103, 108 (S.D.N.Y. 1992).  In its SACC, Lens.com alleges that each of Alcon's products bears the Rx Only and CE symbols, including those products which Alcon alleges were not intended for sale in the U.S.  SACC ¶¶ 178-80, 186-88.  Alcon knows that the products that are allegedly not intended for sale in the U.S. are bought by Lens.com and other similar retailers, imported to the U.S., and sold to U.S. consumers. *Id.* ¶ 200.  Alcon has not attempted to previously block Lens.com from purchasing and importing such products. *Id.* ¶ 201.  Taken as true, these allegations constitute "use in commerce" as defined above.

Secondly, Alcon attempts to persuade this Court to believe that the Rx Only symbol cannot be misleading to consumers because of FDA regulations related to the symbol.  Alcon MTD at 23.  Alcon ignores the Supreme Court on this issue. "[T]he fact that FDCA regulations do not ban or even expressly permit certain wording does not prevent a court in a Lanham Act case from finding that that same wording constitutes false advertising." McCarthy on Trademarks and Unfair Competition 5th § 27.65.50 (discussing *POM Wonderful LLC v. Coca-*

---

[12] This is in direct contrast to Alcon's broad definition of "use in commerce" when discussing its alleged distribution of the O2 Optix contact lenses from the U.S. as evidence of its continued use of the O2 Optix trademarks.  *Compare* Alcon MTD at 21 and 23.

*Cola Co.*, 134 S. Ct. 2228 (2014)). The Second Circuit similarly found "no reason why the subjugation of Defendant's Product labeling to FDA regulation through the § 510(k) process should categorically immunize it from Lanham Act claims by competitors regarding the regulated labeling." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 63 (2d Cir. 2016). Alcon's "legal authority" does not insulate it from liability.[13]

Alcon's attempts to distinguish Lens.com's arguments related to the Rx Only symbol because "Alcon sells the lenses at issue here only outside the U.S. where the FDA has no jurisdiction" is equally unavailing for the same reasons cited in Lens.com's argument related to "use in commerce" above. *Supra* at 21. Finally, Alcon's attempts to discredit Lens.com's arguments related to the DACP packaging insert statement, copyright and trademark symbols, and CE symbol are bare bones and unsupported attempts to remove valid defenses. *See* Alcon MTD at 23. Whether these symbols and statements are symbolic of an authorization to sell these products in the U.S. is a fact issue that is not ripe for decision.

## VI.   Lens.com's Unclean Hands Defense Should Not Be Stricken

A motion to strike should not be granted unless it appears "to a certainty" that the moving party "would succeed despite any state of the facts which could be proved in support of the defense." *See Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 271 (S.D.N.Y. 1999). In its antitrust counterclaims, Lens.com alleges that there is a product market for each specific brand and type of contact lenses, such as Alcon's DACP lenses.[14] Thus, each of the trademarks used on, for example, the DACP product can be and has been used by Alcon as an

---

[13] Alcon's remaining arguments are conclusory, unsupported, and largely irrelevant to the underlying cause of action. *See* Alcon MTD at 23-24. Moreover, whether the statements on DACP boxes about requesting clinical details in the U.S., the copyright and trademark symbols, and the CE mark are misleading to consumers is a question of fact not properly decided on a motion to dismiss.

[14] The Florida MDL has already sanctioned this approach. *See Costco Wholesale Corp.* 2015 WL 9987969 at 25–27.

effective tool to violate the antitrust laws of the United States. SACC ¶¶ 148-57. As such, Alcon

fails to meet its heavy burden to demonstrate "to a certainty" that Lens.com cannot present facts

in support of its unclean hands defense and Alcon's motion to strike should be denied.

Further still, Alcon wholly fails to state how it would be prejudiced by inclusion of this

defense. *See Bennett v. Spoor Behrins Campbell & Young, Inc.,* 124 F.R.D. 562, 564 (S.D.N.Y.

1989). This alone is sufficient to deny Alcon's Motion to Strike. *See Perez v. De Domenico*

*Pizza & Rest., Inc.*, 2016 WL 3774389, at *1 (E.D.N.Y May 31, 2016).

**VII.  Lens.com Has Reasonably Pled Its Failure to Join a Necessary Party Defense**

Lens.com's affirmative defense of Alcon's failure to join Novartis and Alcon Inc. as

necessary parties is based upon Novartis AG and Alcon Inc.'s current and/or prior ownership of

certain trademarks at issue and their control over Alcon's enforcement of those trademarks.

SACC ¶¶ 23-25, 27-30. Lens.com believes that discovery from the files of Novartis and Alcon

Inc. will be relevant and such discovery is unlikely to be had if Novartis and Alcon Inc. are not

made parties to these claims. Further, Alcon fails to explain how it is prejudiced by this defense

or how "to a certainty" this defense would fail. *See* Section VI, *supra*.

**VIII. Lens.com Has Adequately Pled the FDCA Preemption Defense**

Alcon misapprehends Lens.com's FDCA-preemption defense. Part of the relief Alcon

seeks is an injunction prohibiting Lens.com from "distributing Alcon lenses that do not comply

with FDA standards," lenses that "have not been tested against FDA standards," or lenses that

"may not comply with FDA standards." *See* Dkt. No. 74-1 at *25. The FDCA governs the

regulation of medical devices. 21 U.S.C. § 360j(n). As such, claims like Alcon's, which seek a

determination of whether contact lenses are being sold illegally, implicate the FDCA and, by

extension the FDA. Alcon asks this Court to step into the shoes of the FDA, because the relief

Alcon seeks falls within the exclusive province of the FDA. Put simply, questions of whether Lens.com is distributing Alcon lenses that do not comply with FDA standards is one that only the FDA may answer. In any event, significant issues related to this defense remain unresolved, and the Court should deny Alcon's request. And as noted above, Alcon fails to explain prejudice or how "to a certainty" this defense fails. *See* Section VI, *supra*.

## IX.   Lens.com Has Adequately Pleaded the Copyright First-Sale Doctrine Defense

In *Kirstsaeng v. John Wiley & Sons, Inc.*, the copyright first-sale doctrine was held to apply to copies of a copyrighted work lawfully made abroad and intended only for sale outside the U.S. *See* 568 U.S. 519, 523, 530 (2013). Alcon goods sold by Lens.com in the U.S. are marked with a copyright symbol, thereby making the copyright first-sale doctrine applicable to these goods. SACC ¶¶ 25-27. "Trademark law is not intended to allow an owner of a work to prevent the work's distribution when such distribution would otherwise be allowed under copyright law." *Pearson Educ., Inc. v. Allen Air Conditioning Co.*, 2013 WL 5870235, at *2–4 (S.D.N.Y. Oct. 22, 2013). Alcon attempts to avoid the consequences of marking its goods with copyright symbols. It cannot do so. Alcon marked its products to take advantage of copyright law. Alcon is therefore bound by the copyright first-sale doctrine.

## X.   Lens.com Properly Alleged Its Abandonment Affirmative Defense

The Lanham Act defines "abandonment" as nonuse of a trademark with the intent not to resume that use, and abandonment for three years is *prima facie* evidence of abandonment. *See* 15 U.S.C. § 1127. Alcon has admitted that it stopped selling the O2 OPTIX lenses in the United States in 2013. Dkt. No. 20 ¶ 34.  Alcon attempts to create confusion by stating that it only stopped "distributing" the lenses in the U.S.  This distinction is unsupported by any evidence of commercial use.  Alcon clearly has no intent to resume its use, based on its non-use of the marks

since 2013. These allegations state a *prima facie* case for abandonment. *See Patsy's Italian Rest.,*

*Inc. v. Banas*, 575 F. Supp. 2d 427, 450–51 (E.D.N.Y. 2008).

## CONCLUSION

Based on the foregoing, Lens.com respectfully requests that the Court deny Alcon's

motion to dismiss in its entirety.

THORPE NORTH & WESTERN, LLP

By: */s/ Mark Bettilyon*
    Mark Bettilyon (admitted *pro hac vice*)
    Peter M. de Jonge (admitted *pro hac vice*)
    Catherine M. Maness (admitted *pro hac vice*)
    Jed H. Hansen (admitted *pro hac vice*)
    175 S. Main St., Suite 900
    Salt Lake City, UT 84111
    Telephone: (801) 566-6633
    Facsimile: (801) 566-0750
    Email: mark.bettilyon@tnw.com
        dejonge@tnw.com
        catherine.maness@tnw.com
        hansen@tnw.com

CADWALADER, WICKERSHAM & TAFT LLP
William J. Natbony (WJN 5507)
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: bill.natbony@cwt.com

JONES WALDO HOLBROOK & MCDONOUGH
Nathan D. Thomas (admitted *pro hac vice*)
170 S. Main St., Suite 1500
Salt Lake City, UT 84101
Telephone: (801) 521-3200
Facsimile: (801) 328-0537
Email: nthomas@joneswaldo.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

**DEFENDANT LENS.COM'S MEMORANDUM IN OPPOSITION TO MOTION TO**

**DISMISS FILED BY PLAINTIFF ALCON VISION, LLC** was served on all parties as

indicated below:

|  |  |
|---|---|
| Jamie A. Levitt | ☒ Electronic Mail |
| Sarah L. Prutzman | ☐ United States Mail, First Class |
| Janie C. Buckley | ☐ Hand Delivery |
| Michael B. Miller | ☐ Fax Transmission |
| Nicholas Herrera | ☐ CM/ECF Notification |
| Neal Burstyn | |
| Chanwoo Park | |
| Morrison & Foerster, LLP | |
| 250 West 55th Street | |
| New York, NY 10019 | |
| (212) 468-8000 | |
| JLevitt@mofo.com | |
| sprutzman@mofo.com | |
| jbuckley@mofo.com | |
| mbmiller@mofo.com | |
| nherrera@mofo.com | |
| nburstyn@mofo.com | |
| cpark@mofo.com | |

|  |  |
|---|---|
| Jennifer L. Taylor | ☒ Electronic Mail |
| Sabrina Larson | ☐ United States Mail, First Class |
| Morrison & Foerster, LLP | ☐ Hand Delivery |
| 425 Market Street | ☐ Fax Transmission |
| San Francisco, CA 94105-2482 | ☐ CM/ECF Notification |
| (415) 268-7000 | |
| jtaylor@mofo.com | |
| slarson@mofo.com | |

DATED this 17th day of March, 2020.

*/s/ Catherine Maness*
Catherine Maness

26