UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

ALCON VISION, LLC,

                             **Plaintiff,**

-against-

LENS.COM, INC.,

                             **Defendant.**

-------------------------------------------------------- x

**OPINION & ORDER**

**1:18-cv-00407-NG-RLM**

GERSHON, United States District Judge:

## I.    Introduction

This opinion addresses the motion by Plaintiff Alcon Vision, LLC ("Alcon") to dismiss three non-antitrust counterclaims and to strike five affirmative defenses, asserted by Lens.com in its Second Amended Answer and Counterclaims.[1]

Alcon initiated this action against Lens.com, alleging violations of Section 32 of the Lanham Act, § 15 U.S.C. 1114, Section 43(a) of the Lanham Act, § 15 U.S.C. 1125(a), deceptive trade practices under New York General Business Law ("GBL") § 349, false advertising under GBL § 350, and trademark infringement and unfair competition under New York common law. It subsequently filed a First Amended Complaint (the "Complaint"). Lens.com filed an answer, asserting affirmative defenses and counterclaims, including seven antitrust counterclaims. Two of the seven antitrust counterclaims were transferred to a multidistrict litigation pending in the Middle District of Florida, and the other five antitrust counterclaims were dropped by Lens.com, after full briefing on the instant motion. A separate motion for sanctions brought by Alcon,

---

[1] On August 11, 2020, I granted Novartis AG's motion to dismiss the same three counterclaims, as against it, under Rule 12(b)(2) for lack of personal jurisdiction.

against Lens.com, relating to Lens.com's dropping of its counterclaims and alleged discovery failures will be addressed in a separate opinion.

For the reasons discussed below, Alcon's motion to dismiss is granted and its motion to strike is granted in part and denied in part.

## II.    Factual Background

The following facts, which are accepted as true for purposes of this motion, are taken from Lens.com's Counterclaims, unless otherwise noted.   The allegations recounted are only those necessary to decide the present motion.[2]

Alcon, a Delaware corporation with its principal place of business in Fort Worth, Texas, is a producer of contact lenses.   Alcon was a division of Novartis AG, but was "spun off" in a transaction that occurred in the first half of 2019.   Counterclaims ¶ 21.   Lens.com, a Nevada corporation with its principal place of business in Las Vegas, Nevada, is often referred to as a gray market seller.   It sells, at a discount, Alcon lenses, in the United States, that were originally sourced from outside the United States.   Lens.com refers to itself as a discounting retailer.

Alcon owns trademark rights, which it alleges Lens.com infringed when it sold Alcon's contact lenses.   Novartis AG "previously owned" trademark rights, which Alcon also alleges Lens.com infringed when it sold Alcon's contact lenses.   *Id*. ¶¶ 23, 291.   The trademark rights that Novartis AG previously owned have since been assigned to Alcon, Inc., which is an entity different from plaintiff Alcon.   *See* Alcon's Req. for Judicial Notice, ECF Nos. 234, 235.[3]

_____

[2] Because Lens.com dropped the antitrust counterclaims that were not transferred to the MDL, the antitrust allegations recounted are only those necessary to decide the motion to strike the fourth affirmative defense of Unclean Hands, which incorporates Lens.com's antitrust allegations.

[3] Alcon has filed an unopposed request for judicial notice, in which it requests that I take judicial notice of the Notice of Recordation of Assignment from the United States Patent and Trademark Office, which shows that the trademarks previously owned by Novartis AG have been assigned

According to Lens.com, Alcon has engaged in various anticompetitive strategies designed to exclude discounting retailers, like Lens.com, from the contact lens market. Counterclaims ¶¶ 1–3. These strategies include a group boycott of Lens.com, whereby Alcon directed representatives at ten large distributors to stop selling Alcon lenses to Lens.com; exclusive-dealing agreements, which require retailers to purchase Alcon lenses only from Alcon or its authorized distributors, and not from any other source; tying arrangements, which condition the purchase of certain Alcon lenses, on the purchase of all types of Alcon lenses, directly from Alcon; and a price-fixing conspiracy. *Id.* ¶¶ 3, 15, 238.

In addition, through an initiative called "Project Charcoal," Alcon developed U.S.-only packaging for its Dailies Aquacomfort Plus ("DACP") and Air Optix plus Hydraglyde ("AOHG") lenses. *Id.* at ¶¶ 148–49. The packaging changes were undertaken solely to provide legal recourse against discounting retailers, like Lens.com. *Id.* ¶¶ 132, 144, 150, 157. The lenses contained within the new packaging are of identical quality to those sold in the old packaging. *Id.* ¶¶ 152, 207. Alcon's plan is to "gin up" trademark infringement lawsuits against such retailers, when they continue selling Alcon lenses, in old packaging, that they had sourced from abroad. *Id.* ¶ 150.

These are the packaging changes: Alcon added, in fine print, references to a helpline and a brand-specific website, placed product instructions on the outside of the packaging, added an American flag icon in the corner of the packaging, and—for one lens type—added an additional logo and product lot number. *Id.* ¶ 151. Directly underneath the American flag icon is the

---

to Alcon, Inc. I can take "judicial notice of official records of the United States Patent and Trademark Office." *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 345 (S.D.N.Y. 2014).

statement, "For sale in USA only."[4]  These product packaging changes were followed by Alcon serving a trademark infringement lawsuit on Lens.com.  Counterclaims ¶ 167.

In addition to its anticompetitive conduct, Alcon sells a significant number of lenses overseas that are not FDA-compliant, rendering its product packaging for such lenses false and misleading to consumers, including Lens.com.  Alcon has served sworn statements on Lens.com, which stated that a "significant number" of lenses that Alcon sells outside of the United States have not been tested for FDA-compliance and are "non-FDA-compliant."  *Id.* ¶ 195.  The statements indicate that the sale of lenses that are non-FDA compliant have taken place "in certain unspecified countries" outside of the United States.  *Id.* ¶ 278.  Furthermore, Alcon no longer tests the O2 OPTIX® lenses for FDA compliance, which Alcon discontinued selling in the United States in 2013, though it still sells them abroad.  *Id.* ¶¶ 192, 194.

Despite this lack of compliance, Alcon's product packaging for lenses it sells in "certain unspecified countries" overseas contain symbols and statements that convey to purchasers, including Lens.com, that the product complies "with all FDA regulations and all European Union regulations and may be lawfully sold in the United States."  *Id.* ¶¶ 276, 278.  Its packaging

---

[4] While generally limited to consideration of the facts as alleged in the complaint on a Rule 12(b)(6) motion, courts may consider materials incorporated by reference in, or "integral" to, the complaint.  *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  Where a plaintiff has omitted text or images found on a product package, a court may consider the full product package if: (1) the plaintiff relies on the package in framing its complaint, (2) the complaint clearly and substantially references the package, and (3) the authenticity or accuracy of the package is undisputed.  *Gordon v. Target Corp.*, 2022 WL 836773, at *2 (S.D.N.Y. Mar. 18, 2022); *see also N. Am. Olive Oil Ass'n v. D'Avolio Inc.*, 457 F. Supp. 3d 207, 220–21 (E.D.N.Y. 2020).  Here, the U.S.-only packaging changes to the DACP and AOHG lenses form part of the basis for Lens.com's Lanham Act and GBL claims.  Lens.com repeatedly references the U.S.-only packaging changes.  While Lens.com does not explicitly allege that the U.S.-only packaging included the words "For sale in USA only" directly beneath the U.S. flag, the court so found that it did in its order on Alcon's preliminary injunction motion.  And, finally, Lens.com does not object to Alcon's request that I consider this language and does not dispute the accuracy of Alcon's assertion that this language is found directly underneath the U.S. flag on the U.S.-only DACP and AOHG product packaging.

- 4 -

includes an "Rx Only" symbol, which, according to Alcon's own product inserts, means "CAUTION: Federal (United States) law restricts this device to sale by or on the order of a licensed eye care professional." *Id.* ¶ 178–79. The packaging includes "®," "TM," and "©" symbols. *Id.* ¶ 183. Alcon's product packaging for, at least, the DACP lenses states "For USA: Request Package Insert for Clinical Details." *Id.* ¶ 181. Alcon also promotes the sale of its products using "promotional and safety literature, which also contain statements which inform consumers that all Alcon products are safe and meet all criteria for sale in the United States." *Id.* ¶ 184. Collectively, Lens.com refers to these symbols and statements in its Counterclaims as the "U.S. Symbols and Statements." *Id.* ¶ 185. Alcon's product packaging also displays the "CE" symbol—the European Conformity sign, "which is commonly understood to mean that the product containing the CE mark complies with the relevant European Union legislation." *Id.* ¶ 187.

Alcon's new U.S.-only packaging for its DACP and AOHG lenses, as part of the packaging scheme discussed above, is also false and misleads purchasers. The use of the U.S. flag conveys to consumers that all "products displaying the American flag are 'made in America,' which is not the case." *Id.* ¶ 206. The use of the U.S. flag on its product packaging also falsely conveys that its products bearing the American flag are of superior quality, when in fact they are of identical quality. *Id.* ¶ 207.

## III.   Standard of Review

### A.   Motion to Dismiss Counterclaims

A motion to dismiss a counterclaim for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), is evaluated under the same standards as a motion to dismiss a claim in a complaint. *See GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 99 (2d Cir.

2019).  When considering such a motion, the court must accept as true all well-pleaded factual allegations and must draw all reasonable inferences in the counterclaimant's favor.  *See Swiatkowski v. Citibank*, 446 F. App'x 360, 361 (2d Cir. 2011).  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Therefore, to survive a motion to dismiss, a counterclaim must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  *See id*.  Facial plausibility exists when a counterclaimant "pleads factual content that allows the court to draw the reasonable inference that the [party] is liable for the misconduct alleged."  *See id*.  The well-pleaded factual allegations must "nudge[] [the] claims" "across the line from conceivable to plausible."  *See id.* at 680.

### B.  Motion to Strike Affirmative Defenses

The court may grant a motion to strike any "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike affirmative defenses are "generally disfavored."  *Silva v. Hornell Brewing Co.*, 2020 WL 8079823, at *2 (E.D.N.Y. Dec. 1, 2020).  But a plaintiff may prevail when: (1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; or (3) the plaintiff would be prejudiced by inclusion of the defense.  *GEOMC*, 918 F.3d at 96.

The Second Circuit recently clarified these factors.  *See id.* at 95−99.  In considering the first factor, "the plausibility standard of *Twombly* applies to determining the sufficiency of all pleadings, including the pleading of an affirmative defense, but with recognition that, as the Supreme Court explained in *Iqbal*, applying the plausibility standard to any pleading is a 'context-specific' task."  *Id*. at 98 (quoting *Iqbal*, 556 U.S. at 679).  Further:

The key aspect of the context relevant to the standard for pleading an affirmative defense is that an affirmative defense, rather than a complaint, is at issue. This is relevant to the degree of rigor appropriate for testing the pleading of an affirmative defense. The pleader of a complaint has the entire time of the relevant statute of limitations to gather facts necessary to satisfy the plausibility standard. By contrast, the pleader of an affirmative defense has only the 21-day interval to respond to an original complaint, *see* Fed. R. Civ. P. 12(a)(1)(A)(i), the 21-day interval to amend, without court permission, an answer that requires a responsive pleading, see Fed. R. Civ. P. 15(a)(1)(B), or the 14-day interval to file a required response to an amended pleading that makes a new claim, see Fed. R. Civ. P. 15(a)(3). That aspect of the context matters. In addition, the relevant context will be shaped by the nature of the affirmative defense. For example, the facts needed to plead a statute-of-limitations defense will usually be readily available; the facts needed to plead an ultra vires defense, for example, may not be readily known to the defendant, a circumstance warranting a relaxed application of the plausibility standard.

*Id*.

As to the second factor, "an affirmative defense is improper and should be stricken if it is a legally insufficient basis for precluding a plaintiff from prevailing on its claims." *Id*. Regarding the third factor, a "factually sufficient and legally valid defense should always be allowed if timely filed even if it will prejudice the plaintiff by expanding the scope of the litigation." *Id*.

## IV. Discussion

### A.  Counterclaims

#### 1.  Lanham Act Counterclaim, 15 U.S.C. § 1125(a) (Count 9)

##### a.  Use of Symbols and Statements

Section 43(a) of the Lanham Act prohibits false or misleading descriptions or representations of fact "in commercial advertising or promotion" concerning "the nature, characteristics, qualities, or geographic origin of ... goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).  "First (and obviously), a plaintiff bringing a false advertising claim"

must allege falsity. *Bd.-Tech Elec. Co. v. Eaton Corp.*, 737 F. App'x 556, 558 (2d Cir. 2018). Falsity can be alleged in two different ways: literal or implied. *See id.*

A literally false message is one that "conflict[s] with reality." *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 638 (S.D.N.Y. 2018) (citing *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999)). A plaintiff can allege that the challenged advertisement is literally false by showing that it is "false on its face" or that the advertisement's "words or images, considered in context, necessarily imply a false message." *Bd.-Tech Elec.*, 737 F. App'x at 558. The message, however, "must be unambiguous; if the representation 'is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false.'" *Lokai Holdings*, 306 F. Supp. 3d at 638 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)). "If an advertising message is literally false, consumer deception is presumed, and the court may grant relief without reference to the advertisement's [actual] impact on the buying public." *Bd.-Tech Elec.*, 737 F. App'x at 558 (alteration in original) (internal quotation marks omitted). In assessing a claim of literal falsity, a court "may rely on its own common sense and logic in interpreting the message." *Lokai Holdings*, 306 F. Supp. 3d at 638.

Alternatively, under an implied falsity theory, a plaintiff may allege that a message, while not literally false, is "nevertheless likely to mislead or confuse consumers." *Id.* (quoting *Time Warner Cable*, 497 F.3d at 153). "'[P]laintiffs alleging an implied falsehood are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality'—a claim that 'invites a comparison of the impression, rather than the statement, with the truth.'" *Id.* (quoting *Time Warner Cable*, 497 F.3d at 153).

At the evidentiary stage of the case, a plaintiff proceeding under an implied falsity theory generally must "demonstrate that a statistically significant part of the commercial audience holds

the false belief allegedly communicated by the challenged advertisement." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112–13 (2d Cir. 2010).[5]   The question in such cases is: "what does the public perceive the message to be?"   *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992).   The success of such a claim "usually turns on the persuasiveness of a consumer survey."   *Id*.

Of course, at the pleading stage, a plaintiff can state a claim by attaching consumer survey data to, or referencing it in, the complaint.   *See Lokai Holdings*, 306 F. Supp. 3d at 639 n.2.   But the absence of such evidence is not fatal, where the plaintiff pleads non-conclusory facts raising a plausible inference that a statistically significant number of consumers were misled.   *Bd.-Tech Elec.*, 737 F. App'x at 560–61; *Lokai Holdings*, 306 F. Supp. 3d at 639.   A judge in this district, for example, denied a motion to dismiss, where plaintiffs made detailed allegations about the defendants' appropriation of plaintiffs' theatrical performances, including an advertising campaign that used the name of plaintiffs' show, and images of plaintiffs, and sold promotional materials developed by plaintiffs.   *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 453–54, 470 (E.D.N.Y. 2009).   Plaintiffs alleged that the advertisements confused audience members, who expected to see plaintiffs' show and demanded refunds.   *Id*. at 454, 470.

### i.   Literal Falsity

With respect to the lenses bearing the U.S. Symbols and Statements and EU Symbol, which are sold in "certain unspecified countries" abroad, Lens.com fails to plausibly allege literal falsity.

---

[5] Because Lens.com does not allege in its counterclaims, or argue in its opposition, that Alcon "intentionally set out to deceive the public" through "deliberate conduct…of an egregious nature," I do not address this alternative avenue for bringing an implied falsity claim.   *See Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 299 (2d Cir. 1992) (internal quotation marks omitted).

First, some of the U.S. Symbols and Statements have other reasonable interpretations, precluding them from unambiguously conveying the message that Lens.com asserts that they do. Another reasonable interpretation of the "Rx Only" symbol, along with the product insert "CAUTION: Federal (United States) law restricts this device to sale by or on the order of a licensed eye care professional," is the one advanced by Alcon: namely, that the products must be sold by or on the order of a licensed eye care professional. *See* 21 C.F.R. § 801.109 (2022); Use of Symbols in Labeling, 81 Fed. Reg. 38911–01, 38919–20 (Sept. 13, 2016) ("Rx Only…indicates that the drug must be dispensed with a clinician's prescription").

Similarly, the United States Patent and Trademark Office ("USPTO") explains that the "®" and "TM" symbols let "consumers and competitors know you're claiming [a] trademark as yours." *What is a trademark?* USPTO, https://www.uspto.gov/trademarks/basics/what-trademark (last visited May 24, 2022). The owner of a registered trademark may give notice that his mark is registered by displaying "the letter R enclosed within a circle." 15 U.S.C § 1111. For unregistered trademarks, use of the "TM" symbol puts "people on notice that you claim rights in the mark." *Trademark FAQs*, USPTO, https://www.uspto.gov/learning-and-resources/trademark-faqs#type-browse-faqs_1938 (last visited May 24, 2022).

Another reasonable interpretation of the © symbol is that it indicates a notice of copyright. 17 U.S.C § 401. The United States Copyright Office ("USCO") explains that the copyright notice, which includes the © symbol, "is a statement placed on copies or phonorecords of a work to inform the public that a copyright owner is claiming ownership of it." USCO, *Circular 3 Copyright Notice* 1 (2021), https://www.copyright.gov/circs/. And another reasonable interpretation of the "For USA: Request Package Insert for Clinical Details" is, again, the one advanced by Alcon—that United States users of the product can request a package insert if they

- 10 -

want clinical details. Given these other reasonable interpretations, none of these symbols and statements unambiguously convey compliance with all FDA and European Union regulations and that the products may be lawfully sold in the United States.

Second, other allegations are simply too vague and conclusory to plausibly state a claim. Lens.com alleges that Alcon "promotes the sale of its products through the use of promotional and safety literature which also contain statements which inform consumers that all Alcon products are safe and meet all criteria for sale in the United States," Counterclaims ¶ 184, but it fails to identify the specific false statements in the promotional and safety literature that Lens.com claims are literally false. It is, thus, impossible to determine whether Lens.com's claim based on those statements is plausible. *See Barr Lab'ys, Inc. v. Quantum Pharmics*, *Inc.*, 827 F. Supp. 111, 118 (E.D.N.Y. 1993).

Third, and finally, Lens.com has not plausibly alleged that the "CE" symbol is literally false. Even accepting that the "CE" symbol is "commonly understood to mean that the product containing the CE mark complies with the relevant European Union legislation," Counterclaims ¶ 187, Lens.com does not plead a single non-conclusory fact that the products at issue do not comply with European Union legislation. Alcon's alleged sworn statements served on Lens.com refer only to the lack of compliance of Alcon's products with *FDA standards*, not European Union legislation. *See* Counterclaims ¶¶ 190–198.[6]

---

[6] Lens.com also alleges that the use of the "CE" symbol on Alcon products causes purchasers to reasonably believe that Alcon products bearing this symbol "comply with all FDA regulations" and "may be lawfully sold in the United States." Counterclaims ¶ 260. This allegation is not plausible because Lens.com's alleges that the "CE" symbol is "commonly understood" to refer to whether the product complies with "European Union legislation," not FDA regulations or the laws of the United States.

### ii.    Implied Falsity

Lens.com's claim, based on the U.S. Symbols and Statements and EU Symbol, also fails under an implied falsity theory.  Lens.com fails to allege any non-conclusory facts that would allow me to draw a plausible inference that a significant number of consumers were misled.  Contrary to Lens.com's argument that its claim is not appropriate for resolution at this stage, numerous courts have dismissed such claims, where a plaintiff pleaded similarly conclusory allegations.  *E.g.*, *Bd.-Tech Elec.*, 737 F. App'x at 561; *N. Am. Olive Oil Ass'n v. D'Avolio Inc.*, 457 F. Supp. 3d 207, 226 (E.D.N.Y. 2020); *Express Gold Cash, Inc. v. Beyond 79, LLC*, 2019 WL 4394567, at *7 (W.D.N.Y. Sept. 13, 2019); *Lokai Holdings*, 306 F. Supp. 3d at 639.

### b.  Use of the United States Flag

Lens.com does not plausibly state a claim based on Alcon's use of the United States flag on its U.S.-only product packaging.  The Second Circuit's decision in *Forschner Grp., Inc. v. Arrow Trading Co.* ("*Forschner*"), 30 F.3d 348 (2d Cir. 1994), is instructive.  There, the U.S. distributor of a multifunction pocketknife, which was manufactured in Switzerland, brought a false advertising claim against a competitor that marketed a multifunction pocketknife as a "Swiss Army knife," but that was, in fact, made in China.  After a bench trial, and relying on consumer survey evidence showing that the phrase "Swiss Army knife" was likely to cause consumer confusion as to the knife's geographic origin and quality, the district court found that the competitor falsely advertised the knife's geographic origin and quality.

The Second Circuit reversed and held that, before considering consumer survey evidence, a district court must, first, determine whether the designation of geographic origin is "geographically descriptive." *Id*. at 354.  If it is not, as a matter of law, it "cannot be deceptive as to geographic origin under § 43(a) of the Lanham Act." *Id*. at 355.  A "geographically

- 12 -

descriptive term or phrase is one that 'designates geographical location and would tend to be regarded by buyers as descriptive of the geographic location of origin of the goods or services.'" *Id.* (quoting 1 J.T. McCarthy, *Trademarks and Unfair Competition*, § 14.02). "That a phrase or term *evokes* geographic associations does not, standing alone, support a finding of geographic descriptiveness." *Id.* The phrase also must be "considered as a whole." *Id.*

Finding that the phrase "Swiss Army knife" could not "fairly be read to say, 'made in Switzerland' so as to be geographically descriptive," the Second Circuit determined that the competitor was not liable for false advertising under Section 43(a). *Id.* Moreover, because the U.S. distributor's claim of false representation of quality was premised on its claim of false designation of origin, the quality claim also failed.

Here, the U.S. flag on Alcon's packaging cannot fairly be read to say "made in the U.S." so as to be geographically descriptive. While the U.S. flag may "evoke" clear geographic associations, it does not designate geographic origin. *See Milso Indus. Corp. v. Nazzaro*, 2012 WL 3778978, at *20 (D. Conn. Aug. 30, 2012) (holding that "the company name, 'Liberty Casket,' and the iconography of the Statue of Liberty and the American flag…are too general to evoke any specific geographical associations or to support an inference that there is an implied claim of domestic manufacture"). I would reach this conclusion if I were considering the U.S. flag alone, but I am further persuaded that the U.S. flag does not designate geographic origin when considering the language directly beneath the flag: "For sale in USA only." Viewed in the context of that language, the U.S. flag describes where these products may be sold, not the location of origin.[7]

---

[7] The lone case cited by Lens.com does not compel a different result. In *Emco, Inc. v. Obst*, 2004 WL 1737355 (C.D. Cal. May 7, 2004), Diamond Blade Warehouse, Inc. ("DBW"), the seller of industrial cutting tools, including diamond blades, used the brand name "Americut,"

Having found that Lens.com has not plausibly alleged that Alcon falsely designated geographic origin, under *Forschner*, Lens.com's claim that the U.S. flag falsely conveys superior quality, which is premised solely on the fact that the U.S. flag conveys that the products are manufactured in the U.S., also fails. *See Forschner*, 30 F.3d at 356–57.

Lens.com's Lanham Act false advertising counterclaim is dismissed.

### 2. New York State Counterclaim, N.Y. GBL §§ 349, 350 (Count 8)

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state," and GBL § 350 bars "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." In *Goshen v. Mutual Life Ins. Co. of New York*, 774 N.E.2d 1190 (N.Y. 2002), the New York Court of Appeals interpreted the limiting phrase "in this state" to require that the "transaction in which the consumer is deceived…occur in New York," and held that a Florida resident, who purchased life insurance in Florida from a New York insurer did not have a cognizable claim under GBL § 349. *Id.* at 1195–96. Although the life insurance scheme was devised in New York by a company with extensive ties to the state, the plaintiff received the product information in Florida, and purchased the policy, and paid the premiums, in Florida, through a Florida agent. *Id.* at 1196.

---

along with images of an American flag, the Statute of Liberty, Mount Rushmore, and the Space Shuttle on its website and in a printed catalog as part of its marketing for one of its blades. *Id.* at *4. DBW's printed catalog referred to its "factory" in Buffalo Grove, Illinois. *Id.* The Americut blade, however, was not manufactured in the United States. *Id.* at *5. Considering its statement about its factory, the "Americut" brand name, and the display of the symbols, the court held that DPW was barred by the unclean hands affirmative defense from bringing a false advertising counterclaim. *Id.* at *6. Here, by contrast, Lens.com does not premise its claim on any affirmative statements that Alcon's products are manufactured in the United States, no brand names are alleged to reference the United States, and there is only one symbol at issue—the U.S. flag—which includes the statement "For sale in USA only" directly underneath.

Following *Goshen*, a split of authority developed, which derived from two different readings of the New York Court of Appeals' decision, about the appropriate territorial test to employ under GBL §§ 349 and 350. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2d Cir. 2013). One test is a "transaction-based" test, which focuses on the "location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction." *Id*. The other test is "premised on where the victim is deceived" and requires, "for example, that a plaintiff actually view a deceptive statement while in New York." *Id*. at 122–23. While not foreclosing the use of the test that looks to where the victim was deceived, the Second Circuit endorsed the "transaction-based" test in *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013), holding that a plaintiff satisfies GBL §§ 349 and 350's territorial requirements by alleging that "some part of the underlying transaction" occurred in New York. *Id*. at 123 n.4, 124.

Lens.com fails to meet either test. Lens.com alleges that it, and other purchasers, were deceived in "certain unspecified countries," outside of the United States, when they purchased Alcon products that they believed were compliant with all FDA and European Union regulations and could be lawfully sold in the United States. Counterclaims ¶¶ 260, 262. It also alleges that purchasers were deceived by the placement of the U.S. flag on the new U.S.-only packaging, but it does not allege where these purchases took place in the United States. There are simply no allegations that consumers were deceived in New York, or that any part of these transactions occurred in New York. In any event, in its opposition, Lens.com does not respond to Alcon's argument that its GBL §§ 349 and 350 claims should be dismissed on this basis. By failing to respond to Alcon's argument, Lens.com has abandoned these claims. *See Belfon v. Credit Check Total Consumerinfo.com, Inc.*, 2018 WL 4778906, at *8 (E.D.N.Y. Oct. 1, 2018).

For both reasons, the GBL §§ 349 and 350 claims are dismissed.

### 3. Declaratory Judgment Counterclaim (Count 10)

Alcon also moves to dismiss Lens.com's request for a declaratory judgment of trademark non-infringement under the Lanham Act and New York state law on the ground that it is a "mirror image" and, therefore, redundant of Alcon's claims for trademark infringement under the same laws.

"The Declaratory Judgment Act, by its express terms, vests a district court with discretion to exercise jurisdiction over a declaratory action: 'In a case of actual controversy within its jurisdiction...any court of the United States...*may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (quoting 28 U.S.C. § 2201(a)). "Courts have consistently interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). "In order to decide whether to entertain an action for declaratory judgment, [the Second Circuit has] instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade*, 411 F.3d at 389.

In assessing whether a declaratory judgment counterclaim for non-infringement would "serve a useful purpose," in a suit for intellectual property infringement, courts conduct a careful inquiry into the identity of issues raised by the infringement claims and the counterclaim and answer. *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 430 (S.D.N.Y. 2021); *Centro De La Comunidad Hispana De Locust Valley v.*

*Town of Oyster Bay*, 954 F. Supp. 2d 127, 138 (E.D.N.Y. 2013).  "A counterclaim seeking a declaratory judgment may be dismissed if it is duplicative of the counterclaimants' affirmative defenses, does not broaden the scope of the dispute, or would not present a live controversy once the plaintiffs' claims have been resolved on the merits."  *Multimedia Sys. Design,* 551 F. Supp. 3d at 430.

Here, Lens.com's request for a declaration that it did not infringe Alcon's trademarks under the Lanham Act and New York state law mirrors Alcon's claims under the same laws. Lens.com's counterclaim does not broaden the scope of the dispute and would not present a live controversy if plaintiff's claims are resolved on the merits.

Lens.com's declaratory judgment counterclaim for non-infringement of Alcon's trademarks is dismissed.

### B.  Affirmative Defenses

#### 1.  Failure to Join Necessary Party (Third Defense)

Alcon seeks to strike Lens.com's third affirmative defense of failure to join Novartis AG and Alcon, Inc. because they are not necessary parties.  Lens.com alleges that these parties must be joined because Novartis AG "previously owned many of the trademarks in dispute," and Alcon, Inc. "is now the listed owner of the trademarks previously owned by Novartis AG." Answer 24.

Rule 19(a)(1) provides:

**(1)** *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

> **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or

> **(B)** that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > **(i)** as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  For obvious reasons, trademark owners are treated as necessary parties to a trademark infringement action.  *See, e.g.*, *Escamilla v. M2 Tech., Inc.*, 536 F. App'x 417, 420–21 (5th Cir. 2013).[8]  Lens.com has, accordingly, plausibly alleged that Alcon, Inc. is a necessary party.

The same analysis does not apply to Novartis AG.  A party that has assigned its entire interest in United States trademark rights is generally not treated as a necessary party.  *See, e.g.*, *Shima Am. Corp. v. S.M. Arnold, Inc.*, 1989 WL 65014, at *2 (N.D. Ill. June 7, 1989).  Accordingly, Lens.com must do more than plead that Novartis AG "previously owned many of the trademarks" to plausibly allege that Novartis AG is a necessary party.  Answer 24.

The motion to strike is granted as to Novartis AG, but denied as to Alcon, Inc.

### 2.  Unclean Hands (Fourth Defense)

Alcon seeks to strike Lens.com's fourth affirmative defense for "unclean hands."  Lens.com pleads this defense based on "Alcon's anticompetitive and unlawful restraint of trade activities fully set forth in Lens.com's counterclaims and its failure to address the issues set forth in the [Complaint] for more than 20 years."  Answer 25.  Lens.com fails to plausibly allege how the latter allegation—*i.e.*, the "failure to address the issues set forth in the FAC for more than 20

---

[8] *WM Int'l, Inc. v. 99 Ranch Mkt. #601*, 329 F.R.D. 491 (E.D.N.Y. 2019), cited by Alcon, does not support a contrary conclusion.

years"—gives rise to an unclean hands defense, and it has abandoned it in its briefing.  Notably, Lens.com pleaded a laches defense, which is not the subject of this motion.

Lens.com, however, continues to press the argument in its opposition, in support of its unclean hands defense, that Alcon's "trademarks…[have] been used by Alcon as an effective tool to violate the antitrust laws of the United States."  Lens.com's Opp. 22–23.  I will consider whether Alcon's anticompetitive conduct suffices to allege an unclean hands defense with respect to the use of its trademarks.  "The doctrine of unclean hands [under federal law] is based on the principle that since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff."  *Dunlop-McCullen v. Loc. 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d Cir. 1998) (internal quotation marks omitted).  Misconduct that is "unrelated to the claim to which it is asserted as a defense," however, "does not constitute unclean hands."  *Id*.  Thus, the "defense of unclean hands applies only with respect to the right in suit."  *Id*.  "The unclean hands defense under New York law [has a] virtually identical" requirement.  *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 2005 WL 1164073, at *3 (S.D.N.Y. May 18, 2005).

For these reasons, when a defendant brings an unclean hands defense to a trademark infringement lawsuit based on the plaintiff's anticompetitive conduct, the defendant must allege that the "mark itself has been the basic and fundamental vehicle required and used to accomplish the violation."  *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 298 F. Supp. 1309, 1315 (S.D.N.Y. 1969); *accord De Beers LV*, 2005 WL 1164073, at *4; *Deere & Co. v. MTD Holdings, Inc.*, 2004 WL 1794507, at *3 (S.D.N.Y. Aug. 11, 2004); *cf. Phi Delta Theta Fraternity v. J. A. Buchroeder & Co.*, 251 F. Supp. 968 (W.D. Mo. 1966).  In cases rejecting the defense, "the evidence revealed the antitrust activities to be collateral and did not demonstrate that the trademark, as

distinguished from collateral activities with respect to goods bearing the trademark, was itself being used as the prime and effective instrument to effectuate the antitrust activity." *Carl Zeiss Stiftung*, 238 F. Supp. at 1314.

Because the "mark itself" must be "the basic and fundamental vehicle required and used to accomplish the violation," courts have generally not been receptive to the defense. *Id.* Indeed, according to a leading treatise, in "no final reported decision involving trademark infringement has a court actually refused to enforce a trademark because it was used in violation of antitrust law." 6 *McCarthy on Trademarks and Unfair Competition* § 31:91 (5th ed.).

In none of Lens.com's allegations of Alcon's antitrust misconduct—the group boycott of Lens.com, the strategy to bring trademark infringement lawsuits after changing its product packaging, the exclusive-dealing agreements, the tying arrangements, or the price-fixing conspiracy—does Lens.com allege that Alcon's *trademark* was the basic and fundamental vehicle required and used to accomplish the alleged antitrust violations. Lens.com, instead, alleges that Alcon engaged in antitrust violations relating to the goods bearing the marks.[9] This is not enough. The motion to strike this affirmative defense is granted.

### 3. Preemption Pursuant to FDCA (Twenty-Third Defense)

Alcon moves to strike Lens.com's twenty-third defense, which asserts that "Alcon's claims are preempted, in whole or in part, by the Food, Drug & Cosmetics Act ("FDCA"), as the claims fall within the exclusive jurisdiction of the United States under the FDCA." Answer 30.

---

[9] *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269 (S.D.N.Y. 1999), on which Lens.com relies, does not compel a different result. There, after some discovery, the court made clear that the defendant had presented evidence, unlike any of the allegations here, that suggested the possibility that plaintiffs were "directly attempting to misuse their trademarks for anticompetitive purposes." *Id.* at 273. Moreover, *Estee Lauder* was decided before *GEOMC* and, rather than evaluating defendant's affirmative defense for plausibility, merely found that "it is not possible to say that it appears to a certainty," that plaintiffs would succeed in defeating the defense. *Id.* (internal quotation marks omitted).

As an initial matter, it is not clear whether Lens.com is asserting a "preclusion" defense, a "preemption" defense, or both. "In pre-emption cases, the question is whether state law is preempted by a federal statute, or in some instances, a federal agency action," while preclusion concerns "the alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 111 (2014). Lens.com labels its defense "preemption pursuant to FDCA," but asserts that "Alcon's claims"—not just Alcon's state law claims—"are preempted, in whole or in part" by the FDCA. Alcon, for its part, assumed Lens.com was raising a preclusion defense, as it limits its briefing to arguments that the FDCA does not preclude Alcon's federal claims.

In any event, apart from this lack of clarity, the allegations are conclusory, as Lens.com fails to plead why the FDCA precludes or preempts Alcon's claims. Lens.com must do more than assert bare legal conclusions. Alcon's motion to strike this affirmative defense is granted.

### 4.  Copyright First Sale Doctrine (Twenty-Fourth Defense)

As its twenty-fourth affirmative defense, Lens.com pleads the copyright first sale doctrine under Section 109(a) of the Copyright Act, 17 U.S.C. § 109(a). Answer 30. As Alcon brings no claims under the Copyright Act, Alcon's motion to strike this defense is granted. *See Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 655–56, 659 (2d Cir. 2018).

### 5.  Abandonment of O2 Optix Trademarks (Twenty-Fifth Defense)

Lens.com's twenty-fifth affirmative defense is for abandonment of the O2 Optix lenses. Lens.com pleads that Alcon has admitted that it has not used the O2 Optix trademarks in the United States since 2013 and has no intent to resume use. Answer 30–31. Alcon concedes that it "does not sell or distribute O2 Optix lenses in the U.S.," but argues it does "distribute them outside of the U.S." Alcon's Reply 10.

"The abandonment doctrine derives from the well-established principle that trademark rights are acquired and maintained through use of a particular mark." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007).  The "party asserting abandonment bears the burden of persuasion with respect to two facts: (1) non-use of the mark by the legal owner, and (2) lack of intent by that owner to resume use of the mark in the reasonably foreseeable future." *Id*. at 147 (citing 15 U.S.C. § 1127).  "To satisfy the use requirement, application of the trademark must be sufficient to maintain 'the public's identification of the mark with the proprietor.'" *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 851 (2d Cir. 1992) (quoting *Silverman v. CBS Inc.*, 870 F.2d 40, 48 (2d Cir. 1989)).

Pertinent here, the "use" and "nonuse" of the mark relevant to the abandonment affirmative defense is use and nonuse in the United States, not abroad.  *See ITC Ltd.*, 482 F.3d at 153; *Pado, Inc. v. SG Trademark Holding Co. LLC*, 527 F. Supp. 3d 332, 344 (E.D.N.Y. 2021); *Procter & Gamble Co. v. Colgate-Palmolive Co.*, 1998 WL 788802, at *69–71 (S.D.N.Y. Nov. 9, 1998), *aff'd*, 199 F.3d 74 (2d Cir. 1999).

Lens.com plausibly alleges that Alcon has not "used" the O2 Optix marks in the United States and does not have an intent to resume use of the mark in the reasonably foreseeable future.  Alcon's motion to strike this affirmative defense is denied.

## V.     Conclusion

For the reasons stated above, Alcon's motion to dismiss Lens.com's remaining counterclaims is granted.  The motion to strike is granted as to Lens.com's third affirmative defense of failure to join a necessary party, but only as to Novartis AG, fourth affirmative defense of unclean hands, twenty-third affirmative defense of preemption pursuant to the FDCA,

and twenty-fourth affirmative defense of the copyright first sale doctrine.  The motion to strike is otherwise denied.

**SO ORDERED.**

_____/S/_____

**NINA GERSHON**
**United States District Judge**

May 25, 2022
Brooklyn, New York